## MELBA FRANK v. MORRIS A. HEIMANN, Appellant.

In Banc, February 11, 1924.

1. **VOLUNTARY TRUST.** A completely executed voluntary trust will be enforced, and is irrevocable unless the power of revocation is reserved.

2. ——: **Deposit in Bank: Intention.** Where defendant deposited money in a bank, week by week, in his own name "as trustee" for his only child, a little daughter, the essential question, in a suit by her for the fund thus created, is his intention in making

Frank v. Heimann.

the deposits, and whether he intended thereby to clothe her with the full beneficial ownership of the funds and to divest himself of all right to participate therein; and in ascertaining his intention, it is necessary to consider what he did, as well as what he said.

3. ——: ——: ——: **Handling and Using Fund.** Although by the entries in the bank's books defendant was weekly declaring himself trustee for his daughter in the deposits in the bank made by him, the fact that he continuously handled and treated the funds so deposited as though they were his exclusive private property, and used them for other purposes, even in his manufacturing business, whenever occasion called for them, without a thought of replacing them, negatives the idea that by depositing moneys in the bank in his own name as trustee for her he intended that they should become her property, and not continue to be his own. And the fact that his earnings above the costs of operating his business and the living expenses of himself and daughter were not sufficient to pay over to her the weekly deposit, and that to have divested himself of the title to the deposits would have deprived him of all income above a bare living and would have irretrievably crippled his business, helps to make manifest his intention; and notwithstanding a personal account, maintained in his own name, would have served every purpose he mentions as his reason for carrying the account in his name as trustee for her, these facts demonstrate that he did not intend to part with the ownership of the funds.

4. ——: **Executory: Revocation.** Where defendant, at the time he made the first deposit in the bank in his name as trustee for his infant daughter, told the cashier that he wanted to build up a fund for her, and afterwards told the manager of his factory that he wanted to give her something in later years as a nest egg, and another that he opened the account that she might have an account for the future, and the daughter that he was putting the money away for her as a nest egg—all said statements having reference, not to single or specific deposits, but to a fund to be accumulated, and wholly *in futuro* or in process of accumulation—there was no executed trust, but at most an executory and revocable trust; and the appropriation by him to his individual use of the moneys he had thus placed in the tentative trust fund, before it had become a finality, operated as a revocation.

Appeal from St. Louis City Circuit Court.—*Hon. William*

*H. Killoran,* Judge.

REVERSED.

*Morris Tucker* and *Clifford B. Allen* for appellant.

(1) The mere deposit in a bank of his own money in the depositor's name as trustee for another does not create an irrevocable trust, but one revocable at will. 39 Cyc. 67; In re Totten, 179 N. Y. 112; Brabrook v. Boston Bank, 104 Mass. 228; Jenkins v. Baker, 72 N. Y. Supp. 546; Beaver v. Beaver, 117 N. Y. 421; In the matter of Barefield, 177 N. Y. Supp. 392; Taylor v. Henry, 48 Md. 550; In re Began Estate, 183 N. Y. Supp. 941; Thomas v. Newberg Savings Bank, 130 N. Y. Supp. 810; Rush v. Brooklyn Savings Bank, 119 N. Y. Supp. 726; Rambo v. Pile, 220 Pa. St. 235; Cunningham v. Davenport, 147 N. Y. 43. Courts of Equity will always look with suspicion on voluntary trusts without power of revocation. Bispham on Principles of Trusts (9 Ed.) p. 128; Perry on Trusts (6 Ed.) footnote, pp. 132, 133, 134; Wollaston v. Tribe, L. R. 9 Eq. 44; Coutts v. Acworth, L. R. 8 Eq. 558; Hall v. Hall, L. R. 14 Eq. 365; In Rick's Appeal, 105 Pa. 537; Sims v. Brown, 252 Mo. 68; Guernsey v. Mundy, 24 N. J. Eq. 243; Nichols v. Emery, 109 Cal. 323. (2) The question in this class of cases is not whether the preponderance of competent evidence shows that the alleged trust was executed, but it is whether that fact is established by evidence so clear, certain, complete and convincing as to remove all reasonable doubt on the subject. Watson v. Payne, 143 Mo. App. 721; Pitts v. Weakley, 155 Mo. 135; Johnson v. Quarles, 46 Mo. 426; Forrester v. Scoville, 51 Mo. 268; Ringo v. Richardson, 53 Mo. 394; Shaw v. Shaw, 86 Mo. 594; Northrip v. Burge, 255 Mo. 674; Ferguson v. Robinson, 258 Mo. 113; Mulock v. Mulock, 156 Mo. 431; Crowley v. Crowley, 131 Mo. App. 181; Mead v. Robertson, 131 Mo. App. 196; Hartley v. Nicolson, 19 L. R. Eq. 233. (3) Equity does not lend assistance to voluntary disposition of property while they are yet executory. Pennell v. Ennis, 126 Mo. App. 360. The

distinction between executed and executory trusts rests upon the manner in which the trust is declared. Where the limitations of a trust are fully and perfectly declared, it is regarded as an executed trust. Where the limitations are imperfectly declared and the intent of the creator is expressed in general terms, the manner in which the intent is to be called into effect substantially in the discretion of the trustee, the trust is an executory trust. Taylor v. Welch, 168 Mo. App. 232; 28 Am. & Eng. Enc. Law (2 Ed.) 865; Harding v. Union Trust Co., 207 S. W. 68; Citizens Bank v. McKenna, 168 Mo. App. 254. (4) A gift in the form of a trust always involves the intention of the donor. There arises, first, the question whether the trust is tentative or irrevocable, and if it is found irrevocable, there follows the further question as to the term of the trust. Hemmerich v. Dime Savings Institution, 205 N. Y. 350; In Rick's Appeal, 155 Pa. 537; Simms v. Brown, 252 Mo. 68; Guernsey v. Mundy, 24 N. J. Eq. 243; Perry on Trusts and Trustees (6 Ed.), par. 104, and footnote 3 on p. 130; Nichols v. Emery, 119 Cal. 323; Lewin on Trusts, pars. 75, 76; Ambrosius v. Ambrosius, 239 Fed. 474.

*Watts, Gentry & Lee* for respondent.

Appellant created and executed a valid, irrevocable trust in favor of respondent, constituting himself her trustee. Mize v. Bank, 60 Mo. App. 364; Watson v. Payne, 143 Mo. App. 721; Taylor v. Welch, 168 Mo. App. 223; Bank v. McKenna, 168 Mo. App. 254; In re Estate of Soulard, 141 Mo. 660; Harris Banking Co. v. Miller, 190 Mo. 640; Northrip v. Burge, 255 Mo. 641; Harding v. Union Trust Co., 276 Mo. 136. The cases cited under 1 of appellant's "Points and Authorities" have no application to the facts in this case, because no unequivocal act was shown in any of them.

RAGLAND, J.—This is a suit in equity to enforce what is claimed to be an executed voluntary trust in personal property. The petition alleges:

302 Mo. Sup.—22.

"That she (plaintiff) is the only child of defendant; that on or about the 21st day of June, 1905, plaintiff being then a minor, defendant declared his intention to create and execute a trust in her favor and for her benefit, and in pursuance of such intention and as the beginning and nucleus of said trust deposited in the State National Bank of the City of St. Louis the sum of $392.49 in the name of 'Morris A. Heimann, Trustee for Melba Heimann;' that said 'Melba Heimann' is the plaintiff herein and daughter as aforesaid of defendant; that by said deposit defendant created and executed a valid, irrevocable trust for the use and benefit of and in favor of plaintiff, and declared and constituted himself her trustee of said trust; that thereafter and weekly, with few exceptions, beginning June 24, 1905, and ending March 14, 1914, defendant deposited or caused to be deposited the sum of $25 each week to the credit of said account opened as aforesaid by him in said bank on the 21st day of June, 1905, and continuously thereafter kept in the name aforesaid, to-wit, 'Morris A. Heimann, Trustee for Melba Heimann;' that in addition to said deposits there was credited to said trust funds and account by said bank from time to time interest on said deposit; that each and every deposit made as aforesaid was made by the defendant as a deposit on account of said trust, and did constitute and become a part of the trust fund, and interest thereon accruing and credited by the said bank as aforesaid became and constituted a part of said trust fund; that the aggregate amount of said deposits made as aforesaid, with the interest thereon credited as aforesaid by said bank, amounted on March 14, 1914, on which date the last of said deposits was made, to a sum in excess of $12,000, the exact amount of which plaintiff is unable to state, not having in her possession or under her control the necessary information by which the exact amount can be ascertained.

"Plaintiff further states that in entire disregard and in breach and violation of his duties as trustee as aforesaid of said executed and irrevocable trust, of which

defendant declared himself trustee as aforesaid, defendant did from time to time wrongfully convert to his own use all of said trust fund so created as aforesaid except the sum of $1.44, which still remains in said bank to the credit of said trust fund and has failed and refused to account for or pay over to plaintiff any part of said trust fund so converted by him to his own use."

The prayer is for an accounting and for judgment for the total amount deposited to the credit of the alleged trust fund. It is further alleged that certain real estate described in the petition "was purchased and paid for in part by defendant with money wrongfully converted by him out of said trust fund," and it is sought to impress such real estate with a lien to the extent of the funds so used.

The answer is a general denial and a plea of the five-year Statute of Limitation.

With respect to the general situation of the parties and the principal facts out of which the controversy grows, there is but little, if any, dispute. In 1905 and prior thereto, the defendant, under the name of the M. A. Heimann Manufacturing Company, was engaged in the manufacture of show window fixtures, in the city of St. Louis. His wife, Lilly Heimann, was actively assisting him in his business, giving especial attention to the financial end of it. He kept an account with the State National Bank in the name of M. A. Heimann Manufacturing Company in which he deposited the funds employed in the operation of the factory. But such funds as could be withdrawn from the business from time to time, as earnings or savings, were deposited in the same bank in the name of Lilly Heimann.

Mrs. Heimann died in 1905. At the time of her death the balance in the bank to the credit of "Lilly Heimann" was $392.49. Shortly afterward the defendant opened an account in the same bank in the name of "Morris A. Heimann, Trustee for Melba Heimann," and transferred to it the balance standing in the name of Lilly

Heimann. Melba was his only child; she was then ten years of age.

After the death of his wife defendant continued his manufacturing business as theretofore, and as theretofore kept his factory account with the State National Bank in the name of the M. A. Heimann Manufacturing Company. An employee named Judlin was the manager and bookkeeper in charge of the factory. As such he handled the funds of the business, made the deposits in bank and drew checks against the account of the M. A. Heimann Manufacturing Company. When defendant, in 1905, started the account at the bank in the name of Morris A. Heimann, Trustee for Melba Heimann, he instructed Judlin to thereafter deposit $25 a week in that account. These deposits continued to be made until the defendant sold his factory in 1914. Upon the death of her mother, defendant placed his daughter in Forest Park University, where she remained for three terms. In 1908 she went to live with his sister. During the time she was in school he expended between $1100 and $1200 for her tuitution and maintenance; afterward and until she was married, in 1913, he gave her an allowance of $75 a month. In addition to the allowance he paid from time to time debts incurred by her for clothing on charge accounts at various stores. He drew for his own use $35 a week. All of their living expenses, both for himself and his daughter, seem to have been paid from the funds of the M. A. Heimann Manufacturing Company as distinguished from those deposited to the credit of "Morris A. Heimann, Trustee," etc.

Defendant did not permit his employees to draw checks against the account of Morris A. Heimann, Trustee for Melba Heimann. If collections were slow, or for other reasons the factory was short of funds with which to meet its obligations, defendant himself drew a check against this account for whatever sum was needed and turned it over to Judlin, with instruction to replace it when sufficient funds came in. Some of the moneys so

drawn were returned; but the major portion of them never were.

The total amount that was deposited to the credit of Morris A. Heimann, Trustee for Melba Heimann, from the date of the first entry, in June, 1905, until the last, in March, 1914, was $24,094.15. The weekly deposits of $25 made up approximately one-half of this total. The deposits going to make up the remainder were for the most part the proceeds of loans, all personal, except one for $25,000 on defendant's home. The account, however, never at any time showed a credited balance of anything like $24,000. The largest balance appearing at any time on that side of the ledger was $2665.75, on March 16, 1907. At times it was *nil*. A year and a half after it was opened the account became an active checking account. Defendant drew against it not only for the use of his factory, but for other purposes wholly disconnected with its operations. He expended $8000 of the fund in improving two pieces of real estate. On April 16, 1914, the balance remaining to the credit of the fund was $1.44. No further deposits were made after that date, the defendant having sold his factory at about that time.

Defendant sold his manufacturing plant to five of his employees, among others, Judlin, Frank (plaintiff's husband), Frieda Frank, a sister of the latter, and A. Q. Merz. The sale price was $15,000. They paid $1000 in cash and were given five years in which to pay the remainder. They at once incorporated as the M. A. Heimann Manufacturing Company and continued the business. When the purchase money notes became due they did not pay them, claiming that it was the understanding with the defendant that they were to be paid out of the earnings of the business and that there had been no earnings. Upon threats of foreclosure by defendant, however, they obtained the money from some source and settled with him. In this final transaction considerable hostility and bitterness of feeling was engendered on the part of all concerned.

It seems that the pass book, issued by the State National Bank when the account of Morris A. Heimann, Trustee for Melba Heimann, was opened and in which the entries of deposits were made, had been left in the safe at the factory when defendant sold out. It had remained there until after he had forced a settlement of the balance due him on the purchase price. Soon afterward Judlin apparently discovered the pass book and turned it over to the plaintiff, with the remark, as he says, "that it might be of interest to her." Presently this suit was brought.

Plaintiff testified that while she was a little girl going to school her father, at different times, said to her, "I have deposited $25 in the bank for you today. You don't ever have to worry, I will always take care of you. You will always, when you are big, when you are a lady, you will have something. I am putting this money away for you as a nest egg." She further testified that she never knew that her father was using the money until just before the suit was brought.

Judlin testified that within two or three days after Mrs. Heimann died the defendant said to him that he wanted to open up an account for Melba, that he wanted to protect her as well as he could and give her something in later years as a nest egg. He further testified:

"Q. After that time did you ever hear him make any statements concerning this fund, as to what it was, what it was there for, its purpose? A. Many times.

"Q. Well, what would he say? A. Many times if he would have to make any drawing on the fund he would holler about taking the baby's money and money that belonged to the child there."

C. E. Franze, a witness for plaintiff, testified that he was in the employ of the defendant at his factory from 1902 to 1914, as his stenographer first, and then as his bookkeeper; that he had frequently heard the defendant say that his purpose in opening the account in question was to set aside a fund for Melba; that subsequently when money would have to be drawn from the fund for

use in the factory defendant "would always holler and carry on, it was taking the baby's money and all this and that."

Merz testified for plaintiff with respect to what defendant had told him, stating: "He told me that he wanted, since the mother was dead, that he wanted to open an account for Melba that she would have something when she grew older. . . . For a future fund when she grew older. . . . That was not only once but it was told innumerable times."

Frieda Frank, in defendant's employ at the same time, testified to similar statements made by him with respect to the account kept for Melba.

Henry L. Stadler, cashier of the State National Bank, testified for plaintiff in part as follows:

"Q. Do you recall the occasion of Mr. Heimann coming to you and talking concerning the opening up of a trust account with your bank? A. I do—I think I do. Shortly before the opening of this account Mr. Heimann came to see me and stated that he wanted to lay aside a certain amount each week for his little girl, and asked me how I would suggest that it be opened up with the bank, and I suggested that he open an account as trustee for Melba Heimann. She was then an infant, and he stated then that he would have his cashier deposit twenty-five dollars a week for that account, and shortly after that the account was opened.

"Q. Did he say what was his purpose in opening up this account, Mr. Stadler? A. Well, my recollection of it is that he wanted to build up a fund for his daughter.

"Q. Did he say anything about a fund for her education or maintenance, or as a fund when she grew up? A. Well, I don't recollect that he mentioned what specific purpose it was for, except that he wanted to build up a fund for his daughter."

Defendant denied the statements attributed to him by plaintiff's witnesses with respect to his purpose in opening the account in his name as trustee for his daughter. As to such purpose he testified as follows:

"Q.   State the facts relating to the opening of this account.   A.   I had a place of business on Thirteenth and Morrison Avenue and I had a place of business on Washington Avenue, 713.   My wife died.   I had nobody but myself to look after my interest.   Mr. Judlin could draw against every dollar I had in the M. A. Heimann Manufacturing Company.   I wanted an account where no body else had a right to draw but myself.   I never give up the ownership of this account, never allowed anybody to draw on this account.   I opened it to take care of my loans for real estate, for the maintenance of my child, for the education of her, for money I would borrow on real estate, loans from people.   I wanted all the money I possibly could get from the M. A. Heimann Manufacturing Company and put it in that account so that I could control my affairs.

"Q.   How did you handle this account, Mr. Heimann?   A.   I handled that account just like I handled the M. A. Heimann Manufacturing Company account.   I gave Mr. Judlin instructions to draw any money from my child and I would replace it back from the private account to the Manufacturing Company account, and there was other large moneys drawn out of this account, for payrolls, for loans, for wages, for real estate loans, insurance, taxes, was paid out of this checking account.   .   .   .

"Q.   Now, then, what other reason did you have?   A.   Well, I have reasons; so that I would have money enough in that account book to take care of my business.

"Q.   Yes?   A.   To take care of my girl's education and her maintenance, so I could have money if I borrowed on real estate; if I could spare any money out of the M. A. Heimann Manufacturing Company I wanted it to go into that account.

"Q.   Well, now, will you tell me whether you know of any reason why you couldn't have done all of that without using the word 'trustee' and without using the girl's name, if you simply put the account in your in-

dividual name, M. A. Heimann? A. I thought she was the only friend I had; I thought I could use her name.

"Q. That was your reason now, because she was your only friend? A. Yes.

"Q. So you thought you could use her name? A. Yes, I didn't expect she would bring suit against me now, and Mr. Judlin."

Other evidentiary matters will be referred to in the course of the opinion.

The trial court found the issues for plaintiff and rendered judgment in accordance with such finding. The case comes here on defendant's appeal.

I. It is not open to question but that a completely executed voluntary trust will be enforced. [Rollestone v. National Bank of Commerce, 299 Mo. 57; Harding v. St. Louis Union Trust Co., 276 Mo. 136; Northrip v. Burge, 255 Mo. 641; Harris Banking Co. v. Miller, 190 Mo. 640; In re Estate of Soulard, 141 Mo. 642.] It is likewise well settled that such a trust is irrevocable, unless the power of revocation be reserved. [Stephens v. Moore, 249 S. W. 601, 603.] The essential question in this case, however, is with respect to the intention of defendant in voluntarily making deposits of his own money in bank to the credit of himself as trustee for plaintiff. Did he intend thereby to clothe her with the full beneficial ownership of the funds and divest himself of all right to participate therein? Unless he did so intend, he did not create an irrevocable trust. In order to determine what defendant's intention was it is necessary to consider what he did as well as what he said. [Hemmerich v. Union Dime Savings Inst., 205 N. Y. 366; In Matter of Barefield, 177 N. Y. 387; Rambo v. Pile, 220 Pa. St. 235; Tygard v. McComb, 54 Mo. App. 85; Ambrosius v. Ambrosius, 239 Fed. 473.] It will thus appear that while through the entries on the bank's books he was declaring himself trustee for his daughter as to the deposits he was making, he was at the same time handling, using and in all respects treating the funds deposited just as though they

*Intention.*

were his exclusive private property. While he stormed when it was necessary to make a draft on the funds for his factory, and insisted that "the baby's money" must be replaced, he used the funds for other purposes whenever occasion called without any thought of replacing them, "in breach and violation of his duties as trustee," according to the petition. The treating of the funds at all times by defendant as his absolute individual property negatives the idea that by depositing moneys in bank in his own name as trustee he intended that they should thereby become his daughter's and not his. His former employees in testifying as to his attitude with respect to these funds used language which indicates that at the time they regarded "the baby's money" as a joke. (In practically the same phraseology they speak of his "hollering" about using "the baby's money.") And it continued to have that aspect for more than five years after the account had been depleted. Not until feelings of hostility to defendant arose did it emerge as an actual trust.

There are certain general considerations that have a bearing on defendant's intention. At the time he opened the account at the bank in the name of himself as trustee for his daughter his income and possessions were by no means large. Apparently he owned but one piece of real estate, his home, and that was mortgaged for $3500, which he afterward increased to $6000, depositing the proceeds of the increase of the loan in the trustee's account; he owned the factory which he subsequently sold for $15,000 on time payments; but neither at that time nor afterward were its earnings sufficient to pay $25 a week over and above operating costs and the living expenses of himself and daughter; and he was in debt to the State National Bank to the extent of from $6000 to $8000. Under these circumstances it is extremely improbable that he meant to divest himself of the title to the bank deposits of $25 a week; by so doing he would not only have deprived himself of all income above a bare living, but he would have irretrievably crippled his business.

What defendant's real purpose was in maintaining an account with the bank in the name of himself as trustee for his daughter is a matter of speculation. It evidently was not for the purpose of concealing any part of his funds from his creditors, for the bulk of his indebtedness was owing to the bank where he kept the account. He says that he wanted a fund that would be entirely free from the demands of his manufacturing business and which he could freely use for purposes in no way connected with it, and in order to do so he seemed to think it necessary, or at least expedient, to carry a bank account in some name other than his own. In his wife's lifetime he carried it in her name; after her death, he says that he thought his daughter was his only friend, and would never sue him, so he then carried it in hers. A personal account, maintained in his individual name, would have served every purpose he mentioned in his testimony. Notwithstanding, we are unconvinced that he made the deposits in his own name as trustee with the intention of transferring the ownership of the money from himself to his daughter.

II. Viewed from another angle it is clear that the evidence did not warrant the decree *nisi*. If the statements attributed to defendant by plaintiff's witnesses be given full effect according to their import, they do not evidence an executed trust. At the time defendant opened the account he told Stadler, the cashier of the bank, that he wanted to build up a fund for his infant daughter; he said to Judlin that he wanted to give her something in later years as a nest egg; he told plaintiff, "I am putting this money away for you as a nest egg." He said to Merz that he opened the account so that Melba would have a fund for the future. These and many other declarations of a similar character were made with reference, not to single or specific deposits, but to a fund to be accumulated. At the times such declarations were made the proposed fund was either wholly *in futuro,* or else in the mere process of accumula-

*Executory Trust: Revocation.*

tion. Nothing was ever said or done to indicate finality with respect to it. The settlor all the while was endeavoring to acquire the subject-matter of the intended trust. In the meantime the trust was executory and revocable. And the appropriation by the trustor to his individual use of the moneys he had placed in the tentative trust fund operated as a revocation. [Hemmerich v. Union Dime Savings Inst., supra, and other cases last above cited.]

The judgment of the trial court is reversed.

All concur, except *Woodson, J.*, who dissents.

PER CURIAM:—The foregoing opinion by *Ragland, J.*, in Division One is hereby adopted as the opinion of Court in Banc. All concur, except *Woodson, C. J.*, who dissents.

Headnotes 1 to 4: Trusts, 39 Cyc. 92, 68, 70, 69.