Estate of James Belden Bourland, Deceased, Charles B. Bourland, Independent Executor v. Commissioner.
Estate of Bourland v. Commissioner
Docket No. 59284.
United States Tax Court
T.C. Memo 1958-92; 1958 Tax Ct. Memo LEXIS 140; 17 T.C.M. (CCH) 449; T.C.M. (RIA) 58092; May 21, 1958
*140 Where the proceeds of an insurance policy, which named decedent's children as the beneficiaries, were used as a part of the purchase price of a partnership interest acquired by decedent, thereby imposing a trust, under Texas law, for the benefit of the children on that portion of the partnership interest represented by the insurance proceeds so invested and the subsequent accumulation thereto, held, the trust property held by decedent at his death is not properly includible in his gross estate. Held, further, a trust is not established for the benefit of decedent's children in any additional portion of the property in question where decedent made oral declarations of trust with respect to that property but continued to act as its owner in all respects. Wentworth T. Durant, Esq., Republic Bank Building, Dallas, Tex., Robert J. Hobby, Esq., and Wilbur E. Swenson, C.P.A., for the petitioner. J. C. Linge, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined a deficiency in estate tax in the amount of $15,134.90 against the Estate of James Belden [1] Bourland, deceased. The issue for determination is whether *141 one-half of certain property held by decedent, James Belden Bourland, at his death, is properly includible in his gross estate. Findings of Fact Some of the facts have been stipulated and are hereby found as stipulated. Decedent, James Belden Bourland, died testate at Pampa, Texas, on February 16, 1951. His will was duly filed for probate in Gray County, Texas, and approved by the County Court on March 5, 1951. The estate tax return was filed with the collector of internal revenue for the second district of Texas at Dallas, Texas, on June 16, 1952. The decedent's entire estate was bequeathed to his two children, Charles B. Bourland and Mary Kate Bourland Boesch. These children were appointed independent executor and independent executrix of the decedent's estate by the will. Decedent married Ethel Heisler Bourland, hereinafter called Ethel, in 1912 at Clarendon, Texas. At the time of his marriage, decedent was a ranch hand in Collingsworth County, near Quail, Texas. They later moved to a farm south of Clarendon that was owned by Ethel's mother and lived there for two years on a share-crop basis. When Ethel's mother sold the *142 farm, they moved to Clarendon and decedent went to work for the Foxworth Lumber Company. Later, he was transferred to Goodnight, Texas, and worked for the same company there. At one time, the couple lived in Claude, Texas, where he worked for a dry goods company for a period of about two years. Shortly before 1923, decedent purchased a grocery business in Panhandle, Texas, from P. F. Yokum with the help of his sister, Annie Bourland. The business was operated as a partnership with decedent's sister. During the period he managed the store in Panhandle, decedent became involved with another woman, a Mrs. Wade, who frequented the store. When Ethel learned of this situation, she became very disturbed and upset. From that time to her death, Ethel distrusted decedent. However, she did not seek a divorce or a separation from him, and he continued to live with Ethel until the day of her death. Sometime in 1923, decedent, T. W. Woodward, P. F. Yokum, and J. B. Latham, a clerk in decedent's grocery store and a personal friend of his, formed an insurance partnership in Amarillo, Texas, known as the Amarillo Division of the Southern Benevolent Association. All were equal partners. Decedent *143 did not join the group in Amarillo immediately, but remained in Panhandle until he could sell his store. When he was able to join them, decedent paid $5,000 to acquire his interest in the agency, part of which money was furnished by his sister who became a silent partner in the association. The balance of $2,500 decedent borrowed from the Panhandle Bank. The insurance agency sold two types of policies, a $1,500 policy and a $3,000 policy, with a double indemnity clause and some sick benefits. Shortly after the agency was established, each partner purchased insurance policies on their lives and those of their wives. The amount of the policies was, in each case, the maximum amount handled by the agency, namely, $3,000. Because of the continued strained relationship between decedent and his wife, he thought it best if one of the other partners wrote up the policy on Ethel's life. Ethel did not desire to have decedent named as the beneficiary of that policy, and requested that her children, Charles B. Bourland, age seven, and Mary Kate Bourland, age six months, be named beneficiaries. One of the partners wrote the policy as requested by Ethel. During the later part of 1923, decedent *144 received a letter from Mr. and Mrs. Wade demanding a settlement of $3,000 for ruining their lives. He showed the letter to the other partners, who then requested that the Wades come to Amarillo and discuss the matter. They did so and Woodward informed them that they were trying to blackmail decedent and he described the penalties for blackmail. The Wades dropped the matter. In January 1926, Ethel died. She had continued to mistrust decedent up to the time of her death and asked her personal friend, Mrs. Bush, who was with her at the time of her death, to see that the children received the proceeds of the insurance policy written on her life. As she was dying, Ethel asked Mrs. Bush to call the doctor and her mother to the home, but did not ask to see decedent. At that time, Ethel expressed fear that her mother would not arrive before she died. She told Mrs. Bush that she wanted her mother to have the care of the children because she considered her husband irresponsible and because she feared that he would not take proper care of them. At the time of Ethel's death in 1926, the family was living at 2000 Taylor Street in Amarillo, Texas. After Ethel's death, decedent and his children *145 continued to live at the Taylor Street residence, and his wife's mother, Mrs. Heisler, came to live with them. The Southern Benevolent Association paid the proceeds of the insurance policy written on Ethel's life to decedent as guardian for the children. He did not use these proceeds for himself or to support his children. In 1927 Woodward desired to sell the Southern Benevolent Association and produced a buyer for the consideration of the partners. However, Latham and Yokum desired to retain their interests, and, therefore, purchased the interest of both Woodward and decedent. The purchase price was computed on the basis of the outstanding policy members. The total agency value was agreed to be some $12,000, of which decedent's share was about $4,000. Since then, the records of the Southern Benevolent Association have been lost or destroyed including the policy of insurance drawn on the life of Ethel. Following this transfer of the partnership interests, Woodward, Earl O'Keefe, Latham, and decedent purchased a small mutual insurance company in Oklahoma City. Each contributed $3,000 to this venture. After several months, the venture proved a failure and the company was sold to *146 a local doctor for a total of $1,500. Decedent's financial condition after the Oklahome venture was very poor. He took his son, Charles B. Bourland, to Oklahoma City with him when he was liquidating his interests in the venture. The children and their grandmother left the home in Amarillo and moved to a farm in Armstrong County, Texas. Decedent visited the farm quite often, although he did not live there himself. On one occasion he visited the farm to discuss the possibility of investing in another partnership. He lacked funds of his own, and wanted to use the proceeds of the insurance on his wife's life to purchase part of his potential interest. Decedent's mother-in-law agreed that it would be a proper use of the funds to invest the money for the children in that manner. After paying for Ethel's funeral expenses, $2,500 remained of the proceeds of her insurance. This amount, together with a note in the amount of $3,229.38 executed by decedent, were used by him to purchase a one-quarter interest in the Panhandle Insurance Agency. Earl O'Keefe and Wayne O'Keefe were the other partners and they held equal interests. From the date of the purchase, October 17, 1927, to the date of *147 his retirement in 1948, decedent continued as a partner in the Panhandle Insurance Agency. The partners drew salaries measured by their individual efforts in the agency. Earnings in the agency, in excess of these salaries, were left to accumulate in the business and, from time to time, were used to invest in other businesses. The partnership earnings were increased by the sales of other salesmen employed by the agency and dividends from various investments. In 1929, the partnership acquired the stock of Western Building and Loan Co., later known as the Security Federal Savings and Loan Association, as an investment. The partnership managed the Security Federal Savings and Loan Association. Decedent was the secretary-manager of the newly acquired business. In 1930, the Southwestern Investment Company was organized by the partners and several other individuals. Each of the parties acquired small amounts of stock in the original company. Subsequently, the partnership acquired some of the stock of the Southwestern Investment Company. Thereafter, the purchase of this stock became the principal investment of the partnership down through the years. Earl O'Keefe took charge of the investment *148 company, Wayne O'Keefe continued in charge of the insurance agency, and decedent was in charge of the building and loan association. The Panhandle Insurance Agency continued to pay the salaries of the partners for a time. Later the salaries of the partners were paid by the respective businesses of which each was in charge. These salaries never equaled the partners' distributive share of the partnership's earnings. The capital accounts of the partners in the partnership were never in the red, although drawings were made from the capital accounts from time to time. From time to time, the Panhandle Insurance Agency distributed shares of the Southwestern Investment Company stock, which it owned, to the partners. Decedent received the following shares of the Southwestern Investment Company from the partnership prior to the time he withdrew: Date
Number of Shares
6/18/41
148
3/15/43
148
2/19/44
240
7/ 2/45
240
4/30/46
240
7/18/47
240
8/20/48
240
Decedent expressed at various times to friends his satisfaction with the investment he had made for the children. He often stated to others that he held a partnership interest on their behalf, and that he looked *149 upon them as silent partners in that particular venture because of the use of their insurance proceeds to purchase his original share in the partnership. Whenever the partnership contemplated adding new partners, decedent would discuss the matter with his children. In 1938, he sold for $5,850 a share of his partnership interest to a new partner, thus, permitting the O'Keefes to continue to hold a greater interest than himself. After the sale of this share, decedent held a 20 per cent interest in the partnership. Decedent used his salary and distributions from the partnership to pay for the children's expenses and purchases. He helped finance his son's automobile and house. On one occasion, Charles' wife was hospitalized and became worried about the doctor bills and the hospital expenses. Decedent talked with her and explained to her about the partnership investment. He told her that, whenever the family was in need of money, Charles could always obtain whatever he needed from his share in the partnership investment. Decedent's daughter attended Stevens College in Columbia, Missouri, and Southern Methodist University in Dallas, Texas. Her education was financed entirely from the *150 partnership earnings. Her tuition was paid directly by check drawn by her on a bank account decedent had established in their joint names. Her living expenses were paid by her from this same bank account. She was able to draw on the account whenever she needed money for her personal use, as well as to pay the expenses of her education. Because decedent's credit had been well established, the bank did not take legal action against either joint owner when the account was overdrawn, which was often the case, but instead, merely informed him that the account had been overdrawn and to what extent. Decedent would then write a check from his own personal account for the overdrawn amount. Decedent's daughter was not a frugal person and spent a great deal of money. He found it necessary to reprimand her occasionally for her extravagance and often asked her to spend less on herself lest the money run out. His daughter had repeatedly asked to be given some of this money or the assets which were her share of the investment in the partnership. He refused to give her any more than was needed at the time because of her extravagance. In addition, the successful investment of the children's money and *151 the continued accumulation thereon afforded him a personal pride and satisfaction which would not have been possible had he permitted its dissipation. Decedent treated the money he received from the partnership as though it were his and, aside from his repeated declarations that the money was the children's or that he had accumulated it for the children, he used it as he himself saw fit. He reported the distributive share of all dividends received by the partnership on the children's investment on his own Federal income tax return. He declared all partnership income attributable to the same share as his own. His children never believed that there was a need to claim the income as theirs. Decedent did not file fiduciary returns for any portion of the partnership earnings which could have been attributable to the investment of the children's funds. No gift tax returns were ever filed by decedent, nor were the amounts paid to the children from time to time considered by them to be gifts. About 1948, decedent suffered a heart attack and found it necessary to withdraw from the agency and the building and loan association. He discussed the matter with his son Charles and they decided *152 that an inventory should be taken of the partnership assets to determine the value of decedent's share. The transaction was discussed also with decedent's daughter, Mary Kate, who was unable to accompany them to Amarillo for final negotiations. An agreement was reached between the partners whereby decedent was to receive $15,000 in cash, a note for $28,000 and 2,308 shares of Southwestern Investment Company stock, for his share in the partnership, valued at $75,000 to $80,000. Of this amount, $8,500 constituted the original investment of the proceeds of the insurance on Ethel's life and increment thereto. After decedent withdrew his interest from the partnership, he discussed his financial success several times with J. B. Latham, a lifelong friend. In those discussions, he expressed great satisfaction with the ultimate results of the investment which he had made for the children, and declared his belief that he had managed their money well. He also expressed a great relief and vindication of the investment to his partners, Earl and Wayne O'Keefe. He was concerned about the circumstances prior to his wife's death and felt somewhat responsible for her death. Following withdrawal *153 from the partnership, decedent deposited money in two bank accounts. Each account was a joint account in his name and the name of one of his two children, Charles or Mary Kate. He also purchased some Government bonds in similar joint names. During 1950, decedent acquired additional stock in the Southwestern Investment Company by purchase from dividends earned by the stock already owned and from payments received on his withdrawal from the partnership, as follows: Date
Number of Shares
8/15/50
274
9/19/50
259
At the date of decedent's death, the assets he received from the Panhandle Insurance Agency prior to and on retirement, including the insurance proceeds and increment thereto, and the accumulation thereon subsequent to his receipt of those assets, constituted the following: Number
Value
of Assets
Assets
at Death
100
Shares, Bryan Royalty Co. $1
par
$ 25.00
2
Shares, Nevada Oil Company
no par
20.00
8
Savings Bonds, U.S. Series E
2,636.00
2
Investment Shares, Security
Federal Savings & Loan
Ass'n
10,000.00
4,421
Shares, Southwestern Invest-
ment Co., Common
88,420.00
35
Shares, Southwestern Invest-
ment Co., Preferred
700.00
First National Bank, Midland,
Texas, Deposit
937.35
First National Bank, Pampa,
Texas, Deposit
3,954.43
Highland Park State Bank,
Dallas, Texas, Deposit
6,682.84
Southwestern Investment Co.,
check
37.50
Partnership Note, Balance
Due
14,409.32
Interest on Note
185.35
Cash on Person
22.00
Total
$128,049.79
*154 The original insurance proceeds and increment thereto, amounting to $8,500 at the time of decedent's withdrawal from the partnership, had accumulated to $10,500 at the date of his death. The estate tax return for decedent's estate reported the total value of the above listed property, but included only one-half in the gross estate. It was petitioner's position on the return that one-half of the above listed property originated from the investment in the partnership of the proceeds of the insurance on Ethel's life and belonged to the children. Respondent determined that the entire amount was properly includible in the gross estate of decedent and recomputed the tax accordingly. Opinion To the extent that those assets represent the distribution to decedent of his partnership interest and subsequent increment thereto, petitioner contends that one-half of such assets held by the decedent at his death were trust assets held by decedent for the benefit of his children and, therefore, are not properly includible in his gross estate. We agree with the petitioner as to the existence of a trust for the benefit of decedent's children. Respondent denies the existence of such a trust on *155 the ground that the premiums on the policy were most likely paid for out of community funds of decedent and his wife, Ethel, citing . In that case, the Court decided that where the children are not the named beneficiaries of an insurance policy on the life of a parent and the premiums are paid out of community funds, no trust is imposed in favor of the children on the proceeds of the policy. Thus, the cited case involves a different factual situation from that presented here, because we have found as a fact that the children were the named beneficiaries of the policy in question. Since the proceeds of the policy in this case were rightfully the children's, as named beneficiaries, decedent held the proceeds as a trustee for their benefit. See . With respect to that portion of the partnership interest which was purchased with those insurance proceeds, a trust was imposed for the benefit of the children. Decedent's original partnership investment consisted of the insurance proceeds, in the *156 amount of $2,500 and a note in the amount of $3,229.38, or a total investment of $5,729.38. It is petitioner's position that the $5,729.38 investment and the yearly increment thereto accumulated to $75,000 or $80,000 by 1948, the amount distributed to decedent on his retirement from the partnership. This position assumes that there were no changes in the investment account, other than the yearly partnership net earnings after payment of the salaries. However, there is a complete lack of evidence to substantiate such an assumption. In fact, what evidence there is would indicate considerable activity or changes in the investment accounts. For example, decedent's partner Earl O'Keefe testified that at times decedent's withdrawals exceeded his partnership salary, while at other times salary was reinvested by all of the partners. Decedent's daughter, Mary Kate Bourland Boesch, testified that she received her living expenses for college from her interest in the partnership investment, and that she was extravagant in her living. Charles, decedent's son, testified that his house and automobile were financed from his interest in the partnership investment. Charles' wife stated that a large *157 hospital bill was likewise taken care of from the partnership investment. These statements would indicate a considerable change in the partnership investment account, including that portion held in trust. Petitioner has not introduced any evidence with respect to the partnership investment account, other than the above statements. The partnership records could indicate the fluctuations in the investment account, but they are not in evidence. No attempt has been made to indicate the extent to which withdrawals from the children's interest affected the investment account. Undoubtedly, there was some increment in the share of partnership investment which was attributable to the trust. Considering the normal rate of return on invested money and the evidence here which relates to the use of the partnership investment account, we have concluded that the trust assets amounted to $8,500 of the proceeds of the distribution which decedent received on his retirement. Petitioner argues that decedent created an express trust with respect to one-half of the partnership investment by his repeated declarations made to others that the money was the children's. It is well established that a person *158 can create an oral trust in personal property. , affd. (C.A. 7, 1937), dismissed on motion of petitioner, . However, his words and acts must clearly and unequivocally denote an intention to hold henceforth as trustee for the benefit of another. . Decedent treated the income from the partnership as his. He declared all income as his for tax purposes and did not file fiduciary returns or partnership returns with the children as to his portion of the partnership earnings. He determined when the money was to be distributed to his children, and refused to give any monies to them which would have been used for other than expenses. His actions with respect to the income and earnings of the partnership indicate, at most, an intention to make a future gift and as such do not establish a present trust as to those amounts. See ; Fleck v. Baldwin, 141 Tex. 340, . The trust on distribution to decedent of his partnership interest constituted *159 $8,500 of the total $80,000 distribution. Decedent held the trust funds until his death and accumulated additional income thereon. There was no activity with this money other than the accumulation thereto. This accumulation is attributable to the trust fund held by decedent at his death. The trust property held by decedent at his death, which we have found amounted to $10,500, is not properly includible in his gross estate. Decision will be entered under Rule 50. Footnotes
1. Spelled "Beldon" in some of the exhibits.↩