ESTATE OF SEMO A. SULOVICH, DECEASED, HELEN UNKOVICH, EXECUTRIX, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8153-73.    Filed May 17, 1976.

*D. Alden Newland* and *Joseph H. Clancy,* for the petitioner.
*James C. Lynch,* for the respondent.

WILBUR, *Judge:* Respondent determined a deficiency in Federal estate tax due from the Estate of Semo A. Sulovich in the amount of $27,145.16. The sole issue for decision is whether the value of five separate savings accounts established by the decedent in his name as trustee for others is includable in his estate under either section 2038 or 2036.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

The petitioner is the Estate of Semo A. Sulovich, deceased, Helen Unkovich, executrix. The residence of the executrix at the time the petition was filed was Glennie, Mich. Semo A. Sulovich (decedent) resided in Dallas, Tex., at the time of his death on June 8, 1969.

On March 2, 1959, the decedent, an immigrant with a limited knowledge of English, established five separate savings accounts with the Dallas Federal Savings & Loan Association (Dallas Federal) in Dallas, Tex. The accounts were opened in decedent's name as trustee for his niece, Helen Unkovich, and each of her four children.

In connection with each of the savings accounts the decedent executed signature cards which contained on the reverse thereof the following language:

It is expressly understood that Semo Sulovich shall have the exclusive right during his lifetime, to assign, transfer, and sell the Share Account to be issued under the application on the reverse side hereof, and to withdraw the repurchase value of the said share account. In the event of death or incapacity to act of Semo Sulovich then and in that event the beneficiary, whether a minor or an adult, shall have the right to withdraw the repurchase value of said account to be so issued.

This reservation of rights was signed by decedent and accepted by Dallas Federal through its representative, Mr. William C. H. Jackson. The account cards also authorized the bank to act without further inquiry in accordance with writings bearing decedent's signature. It was, however, the general practice of

---

[1] All section references are to the Internal Revenue Code of 1954.

Dallas Federal not to permit withdrawals without a passbook but some exceptions were permitted.

Decedent intended the funds exclusively for his niece and her children. He never intended to withdraw any money from the accounts, did not at any time need the money, and in fact no money was ever withdrawn prior to his death. At the end of 1965, decedent wrote the following letter indicating he intended to transfer the trust account passbooks:

DEAR HELEN & SARA:

Today I received your card and letter in it. What in the H- you going to borrow money when you got in Bank & Savings & Loan, what's wrong with you and Mike? I give you that money for that purpose and here you borrow money and pay interest, what kind of monkey business is that? I am going to send you after New Year's all the books of the Trust fund for the children. You mentioned to send me some kind of book. What the H- I want with them here. I have another account in one of the banks here, is nearly $11,000.00 thousand dollars, that I'm going to withdraw after January 1st, because I don't get any business from them, they moved 3 blocks further. Keep your book and write checks when you need it, for Ann and rest of the family. I am going to sleep little.

Your Uncle,

SEMO

The following month, in accordance with decedent's letter, the passbooks were delivered to his niece.

In 1967 a robbery occurred at the restaurant which decedent owned. Since decedent mistakenly assumed the original trust account passbooks were still in his safe, he obtained duplicate passbooks and forwarded them to his niece.[2]

Decedent never asked that any of the passbooks be returned to him for any reason. Neither the original nor the duplicate passbooks were returned to decedent at any time and were still in his niece's possession at the date of his death.

The bank, through Mr. Jackson, asked for and received the social security numbers of decedent's niece and her four children for the trust accounts. Decedent's niece received annual statements from the bank indicating the interest attributable to each trust account. She reported the interest attributable to the account held as trustee for her on her Federal income tax return.

---

[2] Although Dallas Federal generally required an affidavit of lost passbooks in order to obtain a new passbook (see Tex. Rev. Civ. Stat. Ann. art. 852(a), sec. 6.06 (1964)), decedent was not required to provide an affidavit because Mr. Jackson, an officer of Dallas Federal, had personal knowledge of the robbery.

The interest attributable to the other trust accounts was not reported by the children because they had insufficient income and did not file income tax returns.

In addition to the trust accounts, decedent also established several joint accounts with his niece at Dallas Federal. He periodically withdrew various amounts from these accounts, and in some cases interest was automatically sent to him. He often forwarded the interest to his niece. However, he never attempted to make a withdrawal without a passbook. At the time of his death, the total balance of joint accounts at all savings institutions was $191,145.70.

### OPINION

Respondent contends that the savings accounts here in issue were, at most, revocable trusts and must, therefore, be included in decedent's gross estate under section 2038. Section 2038(a)(1) [3] requires that the value of all property transferred during the decedent's life and subject at the date of death to a power by decedent to revoke the transfer be included in the gross estate. Thus, we must determine whether, at the time of his death, decedent possessed the power to revoke the transfer.

When one person deposits money in his own name as trustee for another the legal implications of that transaction are determined by both the depositor's intent and the effect of that intent under the law of the relevant jurisdiction. Generally, the savings account trust has been recognized as an effective means of transferring to the beneficiary the balance of the account at the depositor's death.

In order to avoid collision with the Statute of Wills the courts have characterized the savings account trust as either a revocable trust in which the beneficiary has a present but defeasible interest or a tentative trust in which the beneficiary's interest in

---

[3] Sec. 2038 provides in pertinent part:

SEC. 2038. REVOCABLE TRANSFERS.

(a) IN GENERAL.—The value of the gross estate shall include the value of all property—

(1) TRANSFERS AFTER JUNE 22, 1936.—To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death.

the account is tentative until the depositor's death. Thus, although the depositor retains the unrestricted right to the account and the beneficiary has an interest only in the balance remaining at the depositor's death, failure to comply with the Statute of Wills has only infrequently resulted in an invalid testamentary transfer. Bogert, Trusts & Trustees, sec. 47 (2d ed. 1965); 1 Scott, Trusts, sec. 58 (3d ed. 1967). See "Savings Account Trusts: A Critical Examination," 49 Notre Dame Law. 686 (1974); "Bank Account Trusts," 49 Va. L. Rev. 1189 (1963); 1 Restatement, Trusts, sec. 58 (2d ed. 1959).

In Texas,[4] however, the savings account trust was declared invalid as a testamentary transfer not executed in compliance with the Statute of Wills. *Fleck v. Baldwin,* 141 Tex. 340, 172 S.W. 2d 975 (1943). In order to establish a valid inter vivos trust, *Fleck* required compliance with the common law essentials for making a completed inter vivos gift. Thus, *Fleck* foreclosed the possibility of a valid trust in which the settlor retained either a power of revocation or a lifetime beneficial interest.

Recent Texas decisions as well as the enactment of the Texas Trust Act have circumscribed the holding in *Fleck.* In *Land v. Marshall,* 426 S.W. 2d 841 (Tex. 1968), the settlor reserved plenary powers, including "the power to require the trustee to sell, dispose of, or encumber the stock and to pay to him the proceeds even though it would extinguish the trust." Nevertheless, the Supreme Court of Texas indicated that the Texas Trust Act specifically sanctions that which *Fleck* prohibited, i.e., an inter vivos trust with retained powers of control.[5] Furthermore, the court held that a valid inter vivos trust need not meet all the requirements of an inter vivos gift. Rather, if the existence of the trust is not contingent on the death of the creator, a valid inter vivos trust has been created and a power of revocation will not delay or invalidate its existence.

Relying on *Land v. Marshall, supra,* a Texas appellate court has held that a trust over which the settlor-trustee retained the power of revocation, the power to modify, and a lifetime beneficial interest, was a valid trust at its inception and not an invalid testamentary transfer. *Westerfield v. Huckaby,* 462 S.W.

---

[4] Since the accounts here in issue were deposited by a Texas resident with institutions in Texas, Texas law must determine the effect of the transactions related thereto.

[5] Although the trust in *Land v. Marshall,* 426 S.W. 2d 841 (Tex. 1968), was declared invalid as an illusory trust, that doctrine is applicable only to trusts involving community property.

2d 324 (Tex. Civ. App. 1970), affd. 474 S.W. 2d 189 (Tex. 1971). There, the settlor-trustee retained a power of revocation as well as the right to deal with the trust property for her own benefit during her lifetime. The interest retained by the settlor-trustee in *Westerfield* was quite similar to that retained by the depositor in a savings account trust, and the language of the Supreme Court of Texas in validating these trusts was very broad. Thus, while Texas law is not clear on this issue, we must conclude that the savings account trusts in the case at bar were valid revocable trusts at their inception.

Differing appellations and theoretical underpinnings are ascribed to savings account trusts, sometimes producing varying legal results. But whether they are called tentative trusts or revocable trusts, the depositor can deal with a savings account trust in essentially the same manner as a bank account in his own name. He is under no duty to avoid commingling or to preserve the trust property; indeed he may appropriate the funds for himself or others, without regard to the duties normally imposed on trustees. The account will generally answer to the depositor's creditors, be subject to a surviving wife's statutory share, and may even be used for funeral expenses. See "Savings Account Trusts: A Critical Examination," 49 Notre Dame Law. 686, 694, 699 (1974). See also "Bank Account Trusts," 49 Va. L. Rev. 1189, 1205 (1963).

Indeed, the contract of deposit between decedent and the bank states that it is "expressly understood" that decedent had the "exclusive right" during his lifetime to "assign, transfer, and sell" the account or to "withdraw" the balance therefrom. It seems crystal clear from both the body of law defining savings account "trusts" and the specific contract here involved that decedent could deal with the account as his own property. We therefore believe that decedent could make a gift of the account in the same manner as if the account were in his own name.[6] *Fasano v.*

---

[6] When these trusts were established in 1959, *Fleck v. Baldwin,* 141 Tex. 340, 172 S.W. 2d 975 (1943), precluded recognition of savings account trusts unless an immediate irrevocable trust was created. As noted, this is apparently no longer the law in Texas. However, the above analysis applies whether or not savings account trusts are recognized in Texas. See *Fasano v. Meliso,* 146 Conn. 496, 152 A. 2d 512 (1959).

It should also be noted that statutes relating to whom the bank may make payment without incurring liability (Tex. Rev. Civ. Stat. art. 852(a), secs. 6.05, 6.08, and 6.12) are for the protection of the bank and are not dispositive of ownership between the depositor, or his legal representative, and third persons. *Reed v. Reed,* 283 S.W. 2d 311 (Tex. Civ. App. 1955); *Pruett v. First Nat. Bank of Temple,* 175 S.W. 2d 658 (Tex. Civ. App. 1943);

*Meliso,* 146 Conn. 496, 152 A. 2d 512 (1959); *Hickey v. Kahl,* 129 N.J. Eq. 233, 19 A. 2d 33 (1941).

To make a valid inter vivos gift the donor must intend to transfer all dominion and control over the property to the donee and the subject matter of the gift must be delivered to the donee. *Wells v. Sansing,* 151 Tex. 36, 245 S.W. 2d 964 (1952); *Forbes v. Forbes,* 430 S.W. 2d 947 (Tex. Civ. App. 1968); *Christian v. Walker,* 381 S.W. 2d 675 (Tex. Civ. App. 1964). When a gift of a chose in action is made, the instrument evidencing the chose must be transferred to the donee.

It is undisputed that a depositor can, with the requisite donative intent, make a gift of an account held in his name by transferring the passbook representing the account. See *O'Donnell v. Halladay,* 152 S.W. 2d 847 (Tex. Civ. App. 1941); *Benavides v. Laredo Nat. Bank,* 91 S.W. 2d 372 (Tex. Civ. App. 1936); *Weems v. First Nat. Bank of Winnsboro,* 234 S.W. 931 (Tex. Civ. App. 1921). See also Brown, Personal Property, sec. 8.3, pp. 161-164 (3d ed. 1975). Similarly, a depositor can make a gift of an account held in his name as trustee for another by transferring the passbook with the requisite donative intent. *Hickey v. Kahl, supra; Fasano v. Meliso, supra.* See Bogert, Trusts & Trustees, sec. 47, p. 366 (2d ed. 1965).[7]

In *Hickey v. Kahl, supra,* decedent opened two savings accounts in his name in trust for his daughter, with whom he lived. He indicated on several occasions that he had established savings account trusts for his daughter. Sometime later, he gave the two passbooks to his daughter with instructions to hide them and say nothing. The Court found a present gift, stating:

---

*Swann v. Morris,* 212 Ga. 460, 93 S.E. 2d 673 (1956). See also 25 Baylor L. Rev. 336, 338 (1973); 18 Baylor L. Rev. 517, 519, 520 (1966).

[7] "[I]n the delivery of a stock certificate, a savings bank passbook, or an insurance policy, we find the same objective guaranty and proof of the donor's executed intent to give, as, in the case of choses in possession, is furnished by the manual delivery of the chose itself." Brown, Personal Property, sec. 8.3, p. 164 (3d ed. 1975). At the time of the gift, Tex. Rev. Civ. Stat. art. 3998, required in the case of a gift of goods or chattels not made by deed or will, that the donee acquire and maintain possession. While this statute was repealed in 1967 and was long ago held inapplicable to gifts of choses in action (*Weems v. First Nat. Bank of Winnsboro,* 234 S.W. 931 (Tex. Civ. App. 1921); *Lord v. New York Life Ins. Co.,* 65 S.W. 699 (Tex. Civ. App. 1901), affd. 95 Tex. 216, 66 S.W. 290 (1902)), the general rule is nevertheless to apply the requirements of delivery, either actual or constructive, to a savings account passbook, much like the delivery requirement applies to a chose in possession. See Tex. Rev. Civ. Stat. art. 852(a), sec. 6.04, providing that the passbook is evidence of ownership of an account. As to the reasons for reqiring delivery, see Meechem, "The Requirement of Delivery in Gifts of Chattels," 22 Ill. L. Rev. 341 (1926).

That Horvath opened the accounts in the form he did, deposited his money therein and made no withdrawals therefrom, is evidence that he had a donative intention toward Mrs. Kahl with reference to the money so deposited, especially when he maintained other savings accounts in his individual name from which he made withdrawals for his own use * * *. * * * Horvath had a heart attack in July, 1939 * * *. Having after his wife's death opened the bank accounts with a donative intent toward his daughter and considering his affection for her, it would be but natural that at that time he would * * * place the passbooks in his daughter's possession. By so doing he carried out his intention to make an absolute gift to her, and he stripped himself of control over the accounts. While mere delivery of the books to her did not transfer full control to her, because she could not make withdrawals without Horvath's signature, that concerned the banks only and did not prevent delivery operating as a then present gift * * * [19 A. 2d at 37].

The case before us is very similar to *Hickey v. Kahl*, but provides even stronger evidence of intent to make a gift. In opening the accounts, decedent had a firm desire to benefit his niece, of whom he was particularly fond, and her children, the last of whom was named "Semo" after decedent. On numerous occasions, decedent communicated this intent to Mr. Jackson of the bank and to his niece. While originally retaining control over the deposits, he never had any intention of withdrawing any money from the accounts; and, true to this intent, he never withdrew a penny in principal or interest, either prior to or subsequent to his delivery of the passbooks to his niece.

Decedent's business and numerous other savings accounts generated income substantially in excess of his ability to spend consistent with his life style. In fact, from about 1953 until his death, decedent sent his niece over $30,000, mostly from interest on other accounts he maintained jointly in his own and his niece's name.

Petitioner never drew any money out of his savings accounts without the passbooks and aside from exceptional situations, the bank did not permit withdrawals without a passbook. Given his limited formal education and difficulty with English, his practice of identifying the passbook with the right to withdraw and the act of withdrawing, and the bank's practice to require the passbook, petitioner undoubtedly regarded possession of the passbook as possession of the savings account, not simply a symbol of dominion and control, but dominion and control in itself.

Against this background, petitioner, in a letter written in December 1965, told his niece that he was sending her the

passbooks for the trust accounts, implying if not stating that the transfer was a continuation of a policy of making gifts, at least in part to eliminate any need for his niece to borrow. In January of 1966, the passbooks were forwarded. The following year, after his safe was broken into, petitioner had duplicate passbooks made and again sent the passbooks to his niece. Decedent, in responding to his temporary lapse of memory, unequivocally indicated that the accounts belonged to his niece.

Decedent's handling of these accounts stands in distinct contrast to his handling of the other accounts he held jointly with his niece. From the inception he never intended to touch the principal and interest on these accounts; he always intended to use the income and principal of the joint accounts as his needs required. He intended these accounts to be held inviolate for his niece and her children; he intended his niece to have only the residue of the joint accounts remaining at his death. He never withdrew any principal or interest from these accounts; he often withdrew the interest on the joint accounts, sending substantial portions of the interest to his niece. He sent his niece all of the passbooks to these accounts early in 1966, while retaining all of the passbooks for the joint accounts. After the burglary, he again sent her (duplicate) passbooks for these accounts, while retaining the passbooks for the joint accounts. The passbooks for these accounts were in his niece's possession at his death several years later, while he retained possession of the passbooks relating to the joint accounts.

Mrs. Unkovich regarded the accounts as her own and this apparently accorded with the bank's understanding, since Mr. Jackson asked decedent for the social security numbers of his niece and her children, for these accounts. These numbers were supplied to the bank, the income information was sent to Mrs. Unkovich, and she reported the income on her return. (The children had insufficient income to require filing returns.)

In summary, decedent never intended to use the money from these accounts; he had no need for the funds; the beneficiaries were his main objects of affection; and he never withdrew any money from these accounts, although he withdrew money from his other accounts. He directly identified ownership and control of the accounts with the passbooks he transferred in January of 1966, and unequivocally indicated his intent that his niece should have the accounts by again transferring duplicate

passbooks a year later. His niece reported the income from her account on her Federal return. On this record, we can only conclude that when decedent transferred the passbooks to his niece, he intended to make a gift of these accounts, and that a gift was effected under the applicable law.[8]

This case is to be sharply distinguished from the *Estate of Michael A. Doyle,* 32 T.C. 1209 (1959); *Estate of Eva Wasserman,* 46 B.T.A. 1129 (1942), affd. 139 F.2d 778 (1st Cir. 1944); and *Estate of Mae Elliott,* 57 T.C. 152 (1971), affd. per curiam 474 F.2d 1008 (5th Cir. 1973), all cited by respondent to justify his determination of a deficiency herein. In *Doyle,* we were unable to find "any unequivocal act or declaration * * * during [decedent's] lifetime indicating an intention to surrender dominion and control" of the account since his "retention of possession and control over the passbook gave him the power to make such withdrawals had he chosen to do so." (32 T.C. at 1214.) In *Wasserman,* with the exception of brief periods after which the passbooks were returned, decedent had possession of the passbooks and actually made withdrawals from the accounts on several occasions. We found that "the decedent alone had access to the accounts and had absolute control over them." (46 B.T.A. at 1133.) On these facts, we decided there was no gift.[9] In *Elliott,* the bonds in question were never delivered, but were retained in decedent's safe-deposit box to which she had access.

Respondent's alternative contention that the funds must be included in decedent's gross estate under section 2036[10] is

[8] "The overwhelming weight of authority accordingly is that a manual delivery with the requisite donative intent, of certificates of stock, *savings account passbooks,* and life insurance policies constitute good gifts of the shares, of the savings account, and of the insurance contract." Brown, Personal Property, sec. 8.3, p. 162 (3d ed. 1975). (Fn. refs. omitted. Emphasis added.)

[9] It is clear that the case turns on its facts, for the First Circuit noted that Massachusetts follows the general rule:

"In Massachusetts it appears to be well settled that an oral gift of a savings bank book accompanied by actual delivery thereof to the donee with intent to pass title, and acceptance by the donee, will transfer ownership." [*Estate of Eva Wasserman,* 139 F.2d 778, 780 (1st Cir. 1944).]

[10] Sec. 2036 reads in pertintent part:

SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

(1) the possession or enjoyment of, or the right to the income from, the property, or

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

similarly without merit. Since we have decided that decedent made a gift of the accounts, he did not retain the right either to possess or enjoy the property or income therefrom or the right to designate the persons who would possess or enjoy the property or the income therefrom. Rather, at the time of the transfer of the passbooks decedent gave up all rights and interests in the property.

Additionally, since we have decided that the decedent made a present gift of the accounts in issue, we need not discuss the difficult issue of whether or not a transfer of the passbooks, even if it was not a gift, made the trust irrevocable.[11] Since decedent made a gift of the accounts, the funds in the accounts were properly excluded from his gross estate. Consequently,

*Decision will be entered for the petitioner.*

---

[11] Tex. Rev. Civ. Stat. Ann. art. 7425b-41 (1960), provides:

"Every trust shall be revocable by the trustor during his lifetime, unless expressly made irrevocable by the terms of the instrument creating the same or by a supplement or amendment thereto. Acts 1943, 48th Leg., p. 232, ch. 148, sec. 41."

This statute is in contrast to the general rule that a trust is irrevocable unless a power of revocation is reserved. The delivery of passbooks of a savings account trust has often been held to make the trust irrevocable, at least in States following the general rule. See *In re Totten,* 179 N.Y. 112, 115, 71 N.E. 748 (1904), "revocable at will, until the depositor dies or completes the gift in his lifetime by some unequivocal act or declaration, such as delivery of the passbook." *Hickey v. Kahl,* 129 N.J. Eq. 233, 19 A. 2d 33 (1941). See Bogert, Trusts & Trustees, sec. 47, pp. 347, 366 (2d ed. 1965). Whether this rule is also applicable in Texas in view of this statute reversing the general rule and the sui generis nature of savings account trusts is a difficult question that we need not decide. See Yao, "Revocation of Trust Under Section 41 of the Texas Trust Act," 7 So. Tex. L. J. 22, 24 (1963); Moorhead, "The Texas Trust Act," 22 Tex. L. Rev. 123, 129 (1944).