In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-04-00088-CV
______________________________


ROY A. AYERS, Appellant
Â 
V.
Â 
GAIL MITCHELL, Appellee


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

On Appeal from the 402nd Judicial District Court
Wood County, Texas
Trial Court No. 2003-401


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Ross


O P I N I O N

Â Â Â Â Â Â Â Â Â Â Roy A. Ayers and his wife, Lorayne, deposited funds in an account at a bank where
they, along with two of their children, Gail Mitchell and Larry Ayers, were signatories on the
account. Mitchell eventually gained sole control over the funds. Roy


 testified that he
demanded a return of the funds. When Mitchell refused, Roy filed suit against her,
alleging, among other things, breach of contract, conversion, breach of fiduciary duty, and
fraud. Roy also sued for "a declaratory judgment that all monies in issue are owned by
Roy A. Ayers and should be returned to Roy A. Ayers." Mitchell counterclaimed, seeking
a declaratory judgment as to the existence of a trust, terms of the trust, and her status as
trustee. The funds at issue were ultimately deposited in the registry of the court. 
Â Â Â Â Â Â Â Â Â Â The case was tried to the court and resulted in a judgment that Roy take nothing by
his suit, that the funds at issue were held in an irrevocable trust for the benefit of Roy, and
that Mitchell was the sole trustee of that trust. The court filed findings of fact and
conclusions of law in support of its judgment. Roy appeals, challenging the material
findings and conclusions made by the court. Because we hold the trial court erred in
finding the existence of a valid trust, we reverse and render judgment that Roy is entitled
to have the funds returned to him. We remand to the trial court the question of Roy's
reasonable and necessary attorney's fees.
Background
Â 
Â Â Â Â Â Â Â Â Â Â In 1998, Roy and Lorayne became concerned about their future health and living
care needs. According to Mitchell's testimony, her parents asked her to take charge of
their life savings to provide for their future healthcare needs. She said that her parents
wanted to "shelter [these funds] . . . from Medicaid." So, on December 18, 1998, Roy and
Lorayne created a savings account at a bank in Winnsboro, depositing approximately
$48,000.00. There were four signatories on the account: Roy, Lorayne, Mitchell, and
Larry. Mitchell's social security number was shown on the account, and she paid the taxes
on the income from the account. Mitchell testified Roy instructed her to keep her siblings
from misusing any of this money. Mitchell's siblings are: Larry, Marsha Kull, and Paul
Ayers.
Â Â Â Â Â Â Â Â Â Â Lorayne died sometime after the creation of the savings account.


 In January 2003,
Roy had surgery to amputate one of his legs. Following Roy's surgery, Mitchell and Kull
broached the subject of Roy living in a nursing home. Larry was opposed to this idea and
took Roy home to live with him. Larry testified he "gutted" his home and did significant
remodeling to make the home accessible for Roy. There was also testimony that Larry
isolated Roy from the rest of the family. Larry, a single person, hired care providers to
come into the house to help with Roy's needs and with the cooking and other household
chores. One caregiver testified it was her understanding from the other caregivers that Roy
was not to be left alone with other members of the family. Jeff Ayers, Larry's son, testified
Larry told him not to associate with Mitchell or Kull, or any of their children. Jeff also
testified that Larry had coached Roy on how to answer questions in court. 
Â Â Â Â Â Â Â Â Â Â In June 2003, Mitchell became aware that Larry had been writing checks of
increasing value on Roy's checking account (not the account the subject of this suit). 
Mitchell then removed the funds in question from the savings account and opened a new
account, with herself and Kull as signatories. Kull's name was removed from the account,
at her request, leaving Mitchell as the only signatory. Mitchell testified she viewed herself
as trustee of these funds and felt responsible to protect the money and see to it that the
money was used for Roy's reasonable medical needs and for his "comfortable living
expenses." 
Trial Court's Findings and Conclusions 
Â Â Â Â Â Â Â Â Â Â In its written findings of fact, the trial court found, among other things, that the bank
account in question did not reflect that Mitchell was a trustee; that Roy and Lorayne
intended that Mitchell hold the account subject to their requirements for comfortable living
and medical needs; that Roy, Lorayne, Mitchell, and Larry were permitted to withdraw from
the account; that Larry exerted undue influence over Roy; that the only withdrawal from the
account made by Mitchell was for the construction of a bridge requested by Roy; that Roy
was disoriented on the day of trial; that Roy was unable to care for himself; that Roy and
Lorayne intended to completely divest themselves of any legal interests in the account in
question; that Roy never made a demand on Mitchell for return of the account before filing
suit; and that Roy and Lorayne intended for Mitchell to have complete control over the
account subject only to their needs for healthcare and comfortable living.
Â Â Â Â Â Â Â Â Â Â In its conclusions of law, the trial court concluded that Mitchell is the trustee of the
funds in the account in question; that the trust was intended to be irrevocable; that the trust
became irrevocable on the death of Lorayne; that Roy is in need of a guardian; that, should
any of the trust fund remain after the death of Roy, the trust terminates and the funds shall
be paid out equally to the children of Roy and Lorayne; and that Roy and Lorayne intended
to and did divest themselves of any interest in the trust fund except as beneficiaries
thereof.
Roy's Contentions
Â Â Â Â Â Â Â Â Â Â Â Roy contends the evidence established as a matter of law that Roy revoked the
trust, and that failing to so find was against the great weight and preponderance of the
evidence. He also contends the evidence established that Roy and Lorayne intended Larry
and Mitchell to be joint trustees, and failing to so find was likewise against the great weight
and preponderance of the evidence. Roy further contends the trial court erred in enforcing
an oral trust and in ordering the trust res be divided equally among Roy's children following
his death. Finally, Roy contends the trial court should have awarded him attorney's fees.
Standards of Review
Â Â Â Â Â Â Â Â Â Â Findings of fact in a case tried to the court have the same force and dignity as the
findings made by a jury in its verdict. City of Clute v. City of Lake Jackson, 559 S.W.2d
391, 395 (Tex. Civ. App.âHouston [14th Dist.] 1977, writ ref'd n.r.e.). Findings of fact are
not conclusive, however, when a complete reporter's record appears in the record. 
Middleton v. Kawasaki Steel Corp., 687 S.W.2d 42, 44 (Tex. App.âHouston [14th Dist.]),
writ ref'd n.r.e., 699 S.W.2d 199 (Tex. 1985).
Â Â Â Â Â Â Â Â Â Â In conducting a legal sufficiency review of a trial court's findings, the judgment will
not be set aside if there is any evidence of a probative nature to support it. Ray v.
Farmersâ State Bank, 576 S.W.2d 607, 609 (Tex. 1979) (citing Cavanaugh v. Davis, 149
Tex. 573, 235 S.W.2d 972 (1951)). An appellate court cannot substitute its own findings
of fact for those of the trial court if there is any evidence in the record to sustain the trial
court's findings. Id. 
Â Â Â Â Â Â Â Â Â Â In reviewing the trial court's findings for factual sufficiency, we consider all the
evidence in the record, including any contrary to the trial court's judgment. Plas-Tex, Inc.
v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989). The trial court's findings may be
overturned only if they are so against the great weight and preponderance of the evidence
as to be clearly wrong and unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). 
Â Â Â Â Â Â Â Â Â Â A trial court's conclusions of law are reviewed de novo. In re Humphreys, 880
S.W.2d 402, 404 (Tex. 1994). 
Evidence of Oral Trust Not Legally Sufficient
Â Â Â Â Â Â Â Â Â Â We begin our analysis with Roy's contention the trial court erred in enforcing an oral
trust. In general, a trust must be in writing to be enforceable. Tex. Prop. Code Ann.
Â§Â 112.004 (Vernon 1995). That statute requires a trust in either real or personal property
to be created with a written document. However, a trust in personal property may be
created, and the trust enforced, where there is a) a transfer of the trust property; b) to a
trustee; c) who is neither settlor; d) nor beneficiary; e) if the transferor expresses at the
time or before the transfer his or her intent to create a trust. Tex. Prop. Code Ann.
Â§Â 112.004(1). A trust meeting these requirements need not be in writing. 
Â Â Â Â Â Â Â Â Â Â Mitchell contends, and the trial court found, that Roy, as settlor, transferred the
funds in question to her as trustee. The Texas Property Code defines "beneficiary" as "a
person for whose benefit property is held in trust, regardless of the nature of the interest." 
Tex. Prop. Code Ann. Â§ 111.004 (Vernon Supp. 2004â2005). Mitchell does not contend,
and the evidence does not show, that Mitchell is a beneficiary of the alleged trust. The
evidence does show that, at the time or before the bank account in question was created,
Roy made statements to Mitchell consistent with creating a trust. Fatal to Mitchell's
contention that an oral trust was established, however, is the absence of a complete
transfer of the alleged trust property.As it pertains to trusts, the Texas Property Code does not contain a definition of
"transfer." See Tex. Prop. Code Ann. Â§ 111.004. However, in a case construing, in part,
certain bank savings accounts opened by the account holder "in trust" for others, the Texas
Supreme Court held that such trusts are governed in general by the rules applicable to gifts
and explained that:
The principal difference between such a trust and a gift lies in the fact that
in the case of a gift the thing given passes to the donee, while in the case of
a voluntary trust only the equitable or beneficial title passes to the cestui qui
trust. In each case the equitable title must pass immediately and
unconditionally and the transfer thereof must be so complete that the donee
might maintain an action for the conversion of the property. Absent a
completed gift of the equitable title, no trust is created, for an imperfect gift
will not be enforced as a trust merely because of its imperfection.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â . . . .
Â 
"But the peculiarity with respect to these so-called 'savings bank trusts' is
that the courts require that the declarant shall express his intent to create a
trust more clearly and by a larger number of acts than in the case of an
ordinary trust. The deposit of money in a bank under a trust title is
considered equivocal. Men frequently deposit money under a trust title from
other motives than that of creating a trust."

Fleck v. Baldwin, 141 Tex. 340, 172 S.W.2d 975, 978 (1943) (holding insufficient evidence
of trust creation, particularly, lack of evidence of original owner's intent to yield control over
funds in question).
Â Â Â Â Â Â Â Â Â Â More recently, the Eastland Court of Appeals held that the intent of the donor is the
principal issue in determining whether a gift has been made. Hayes v. Rinehart, 65
S.W.3d 286, 289 (Tex. App.âEastland 2001, no pet.). That case was one brought by the
testator's son seeking, in part, a determination that funds in a certificate of deposit (CD)
account in the name of the testator's daughter were property of the estate, not a gift to the
daughter. Part of the court's consideration in upholding the trial court's finding that there
was no transfer of the funds by gift was the fact that the testator had used money from
another CD account to purchase a pickup truck after also placing that CD account in the
daughter's name. Id. Significantly, the court also noted that the testator had, similar to the
instant case, placed the CD account in his daughter's name to be eligible for Medicare and
Medicaid benefits. Id.
Â Â Â Â Â Â Â Â Â Â In another case, a mother put a CD in her name and in the name of her children,
and the children asserted that this act constituted a gift as a matter of law. In rejecting the
children's contention, the Dallas Court of Appeals held that, for a gift to be effective,
delivery must divest the donor of all dominion and control over the gift. McConathy v.
McConathy, No. 05-95-01036-CV, 1997 Tex. App. LEXIS 1592, at *9â11 (Tex.
App.âDallas Apr. 1, 1997, pet. denied) (not designated for publication). The court, noting
that the mother, as a joint account holder of the CD, had the authority to dispose of the CD
without the children's consent, further stated: 
[The mother's] placing [the children's] names on the CD did not divest her of
all dominion and control over the CD or immediately and unconditionally vest
[the children] with ownership of the CD. Thus, [the mother's] action of having
[the children's] names placed on the CD account with her own name did not
establish present donative intent and delivery as a matter of law.

Id. at *11.

Â Â Â Â Â Â Â Â Â Â Applying these principles applicable to gifts, we hold that, to have a "transfer of the
trust property to a trustee," as contemplated by Section 112.004(1), the transfer must
divest the trustor of all dominion and control over the trust res.
Â Â Â Â Â Â Â Â Â Â In the instant case, there is evidence that, at or before the time the funds in question
were placed in the savings account, Roy and Lorayne instructed Mitchell to take charge
of such funds to provide for their future healthcare needs. Further, Roy's niece, Irene
Ayers (daughter of Roy's brother) testified Roy told her that Mitchell was in charge of Roy's
finances. However, the evidence further shows that neither Roy nor Lorayne ever divested
themselves of all dominion and control over these funds. They both remained as
signatories on the account where the funds were located. As such, they expressed their
intent to retain control over such funds. It is axiomatic that, when an order to pay from an
account has been signed by an authorized signer on the account, the order is to be paid. 
See Tex. Bus. & Com. Code Ann. Â§ 4.401(a) (Vernon 2002) (bank may charge account for
amount of item "properly payable") and Â§ 4.402(b) (Vernon 2002) (bank that refuses to pay
item "properly payable" may be liable for wrongful dishonor). Roy and Lorayne remaining
as signatories on the account defeats any claim that the funds in that account were
transferred away from them.
Â Â Â Â Â Â Â Â Â Â Roy's continued control over the account is also shown by Mitchell's own testimony
that her father instructed her to deduct $2,425.00 from the account to reimburse Mitchell
for the cost of a bridge she had built on Roy's property. Roy's authorization of this
expenditure shows his continued control over these funds and is inconsistent with the view
that a complete transfer of those funds away from himself ever took place. Roy's
continued control of the funds is also shown by evidence that he made one or more loans
to Larry from those funds. 
Â Â Â Â Â Â Â Â Â Â The undisputed evidence shows that Roy had control over these funds until Mitchell
moved them, without Roy's knowledge or consent, into an account where she had sole
control. We hold, as a matter of law, there was never a "transfer of the trust property to
a trustee" as contemplated by Section 112.004(1). In the absence of a writing representing
the creation of a trust, and in the further absence of a complete transfer of the funds, we
hold that, as a matter of law, no valid trust was created. Accordingly, we sustain Roy's
point that the trial court erred in enforcing an oral trust.
Any Trust Created Was Revocable
Â Â Â Â Â Â Â Â Â Â Notwithstanding our conclusion that no valid trust was created, we will address
Roy's contention that the evidence established, as a matter of law, that Roy revoked any 
trust created and that the trial court's failure to so find was against the great weight and
preponderance of the evidence. Even if a valid trust had been created, we hold that, as
a matter of law, any such trust was revocable and that it was revoked by Roy. 
Â Â Â Â Â Â Â Â Â Â The trial court found the alleged trust to be irrevocable. That finding, however, is
not supported by the evidence and is contrary to law. Trusts created under Texas law are
revocable, unless made specifically irrevocable. Westerfeld v. Huckaby, 462 S.W.2d 324,
327 (Tex. Civ. App.âHouston [1st Dist.] 1970), aff'd, 474 S.W.2d 189 (Tex. 1971). The
irrevocability of a trust must appear from the terms and language of the instrument creating
the trust. Tex. Prop. Code Ann. Â§ 112.051(a) (Vernon 1995). Otherwise, the trust is
revocable. See Tex. Prop. Code Ann. Â§ 112.051(a), (b) (Vernon 1995). Here, there was
no written document establishing the trust and stating its purposes, duration, or whether
it was revocable. The alleged oral trust was, as a matter of law, revocable. 
Â Â Â Â Â Â Â Â Â Â Mitchell contends, and the trial court concluded, that the supposed trust was
intended to be irrevocable and became irrevocable when Lorayne died. Mitchell cites
Citizens Nat'l Bank v. Allen, 575 S.W.2d 654, 658 (Tex. App.âEastland 1978, writ ref'd
n.r.e.), in support of her position that a trust becomes irrevocable on the death of the
trustor. That case, however, dealt with only one settlor, and the Eastland court qualified
its holding with the following language: 
[W]hen a valid inter vivos revocable trust is established and not revoked
during the lifetime of the trustor, it becomes irrevocable upon his death, and
there being no other unfulfilled purposes of the trust expressed, the trust
terminates and is enforceable by the beneficiary. 

Id. (Emphasis added.)

Â Â Â Â Â Â Â Â Â Â Obviously, where there is only one settlor of a trust, and he or she dies, that settlor
is no longer capable of revoking the trust and, there being no other purpose, the trust
becomes irrevocable. Where, however, there are multiple settlors, and one dies, but there
are purposes of the trust yet unfulfilled, such trust does not become irrevocable on the
death of one settlor. That is the situation here. Any trust that existed did not become
irrevocable at Lorayne's death, because Roy survived Lorayne and at least part of the
trust's purposeâproviding for Roy's healthcare needsâremained unfulfilled. Further, none
of the evidence showed that Ray and Lorayne intended the alleged trust to be irrevocable. 
We hold, therefore, that, even if a valid trust was created, it was revocable as a matter of
law. 
Â Â Â Â Â Â Â Â Â Â We also hold that, as a matter of law, Roy revoked any such trust. In so holding,
we recognize the testimony on this issue was conflicting. Roy testified he made demand
on Mitchell for return of the funds. Mitchell testified Roy did not request a return of the
funds. The trial court, believing Mitchell and disbelieving Roy, found that Roy never made
a demand on Mitchell for a return of the funds before filing suit. The trial court further
found that Roy was "disoriented" at the time of trial and that he was incapable of managing
his financial affairs. The trial court concluded, as a matter of law, Roy was in need of a
guardian. 
Â Â Â Â Â Â Â Â Â Â The trial court, as fact-finder, was the sole judge of the credibility of the witnesses
and the weight to be given their testimony. As such, it was the court's prerogative to
believe Mitchell's testimony and disbelieve Roy's. However, the issue of guardianship was
not before the court. Indeed, the trial of this cause was abated pending a judicial
determination of Roy's need for a guardian by a district court in Titus County. The
application for such guardianship (filed by Kull) was denied December 11, 2003. This case
was reinstated April 8, 2004, and went to trial April 30, 2004. The trial court also found that
Larry exerted undue influence over Roy, but that finding is not linked to any specific
conduct by Larry or Roy, and the effect of that finding is not stated. 
Â Â Â Â Â Â Â Â Â Â Aside from the conflict in the testimony concerning whether Roy revoked the alleged
trust, Roy contends, and we agree, that the act of filing suit was itself a demand by Roy for
a return of the funds and a revocation of the alleged trust. We find it significant that the
trial court, in its finding that Roy never made a demand on Mitchell for a return of the funds,
limited its finding to the period "before filing suit." Further, Roy's testimony at trial made
it unmistakably clear he was demanding a return of his funds. We hold that, even if Roy's
funds were held in trust, as a matter of law, he revoked that trust by his act of filing suit and
by his testimony at trial that he was demanding a return of his funds. The trial court's
failure to so find was against the great weight and preponderance of the evidence. 
Attorney's Fees 
Â Â Â Â Â Â Â Â Â Â Roy's last point of error asserts he would be entitled to recover his attorney's fees
in this action under Tex. Civ. Prac. & Rem. Code Ann. Â§ 37.009 (Vernon 1997). Roy sued
for "a declaratory judgment that all monies in issue are owned by Roy A. Ayers and should
be returned to Roy A. Ayers." Having sustained that contention, we agree that Roy is
entitled to his reasonable and necessary attorney's fees as are equitable and just.
Summary and Conclusion
Â Â Â Â Â Â Â Â Â Â Because we hold that no valid trust was created in this case and that, even if such
trust was created, it was, as a matter of law, a revocable trust and was revoked, we find
it unnecessary to address Roy's other points of error.
Â Â Â Â Â Â Â Â Â Â We reverse and render judgment that Roy owns all the funds in issue and that such
funds should be immediately returned to him. We remand to the trial court the
determination of Roy's reasonable and necessary attorney's fees under Section 37.009 of
the Texas Civil Practice and Remedies Code.



Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Donald R. Ross
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice 
Â Â Â Â Â Â Â Â Â Â Â 
Date Submitted:Â Â Â Â Â Â June 16, 2005
Date Decided:Â Â Â Â Â Â Â Â Â July 12, 2005



text-justify:inter-ideograph;
mso-pagination:widow-orphan'>
Â 

   Before Morriss, C.J.,
Carter and Moseley, JJ.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Opinion by Chief Justice Morriss








Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  O P I N I O N

Â 

Â Â Â Â Â Â Â Â Â Â Â  In pursuit
of the sale of a 545-acre farm in Wood County, from William Earl Norris and
wife, Martha Sue Norris, to Eleanor Fox Davis,[1]
to take place in one certain closing and one possible closing, the Norrises and
Davis signed three different contracts to sell, all dated November 5,
2003.Â  The contemplated initial closing
was held, but a subsequent dispute arose concerning an option to purchase the
balance of the farm and whether the option was properly exercised.

Â Â Â Â Â Â Â Â Â Â Â  Davis sued
for specific performance or damages.Â  The
Norrises responded with their motion for summary judgment based on the single
ground that Davis failed to timely exercise the option.Â  On August 13, 2010, the trial court granted
the Norrises summary judgment that Davis take nothing.[2]Â  

Â Â Â Â Â Â Â Â Â Â Â  From that
summary judgment, Davis appeals, asserting that summary judgment was error
because the stated nine-month notice was not a condition to the exercise of the
option, that DavisÂ exercise of the option was effective, that fact issues
exist concerning which contract applies (and thus which option controls) and
whether there was a waiver of the nine-month notice requirement, and that
summary judgment was improper because it did not address DavisÂ claim for
damages.Â  We reverse the summary judgment
and remand this case to the trial court for further proceedings, because (1)
the option in the third contract is the controlling option, and (2)Â the
contract is ambiguous on what action would constitute an exercise of the
option.[3]

Â Â Â Â Â Â Â Â Â Â Â  The NorrisesÂ
motion for summary judgment was of the ÂtraditionalÂ sort.Â  To prevail on a traditional motion for
summary judgment, a movant must establish that there is no genuine issue as to
any material fact and that the movant is entitled to judgment as a matter of
law. Â Tex.
R. Civ. P. 166a(c); Fort Worth
Osteopathic Hosp., Inc. v. Reese,
148 S.W.3d 94, 99 (Tex. 2004); City of
Houston v. Clear Creek Basin Auth., 589 S.W.2d 671 (Tex. 1979). Â To gain a traditional summary judgment, the
defendant must conclusively negate at least one element of each of the
plaintiffÂs theories of recovery or plead and conclusively establish each
element of an affirmative defense. Â Sci. Spectrum v. Martinez, 941 S.W.2d 910, 911 (Tex. 1997).Â  Because
the movant bears the burden of proof, all conflicts in the evidence are
disregarded, evidence favorable to the nonmovant is taken as true, and all
doubts as to the genuine issues of material fact are resolved in favor of the
nonmovant. Â Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546 (Tex. 1985); see Limestone Prods. Distrib., Inc. v. McNamara, 71 S.W.3d 308, 311
(Tex. 2002); Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217, 223
(Tex. 1999).

(1)Â Â Â Â Â Â Â  The Option in the Third
Contract Is the Controlling Option

Â 

Â Â Â Â Â Â Â Â Â Â Â  The dispute
in this case centers around the option to purchase the remainder of the
NorrisesÂ farm.Â  On November 5, 2003, the
parties signed three contractsÂcontracts which are not individually dated.Â  In the first contract, Davis contracted to
purchase 215.405 acres of the approximately 545-acre farm owned by the
Norrises.Â  In the second contract, Davis
contracted to purchase 9.5 acres and a house.Â 
This second contract is sometimes called the homestead contract by the
parties, as its purpose was to carve out homestead property so Davis could claim
a homestead exemption for tax purposes.Â  In
the third contract, Davis contracted to purchase Â210Â±Â acres, which the
parties agree is intended to be the balance of the land to be part of the
original purchase, beyond the homestead property.Â  The parties closed on the homestead contract
and the third contract sometime in December 2003.Â  This left the option to purchase pending.

Â Â Â Â Â Â Â Â Â Â Â  The options
set out in the first contract and the third contract would allow Davis to
purchase, on or before January 1, 2007, essentially the remainder of the
545-acre farm not already purchased.Â 
Exhibit A made part of the first contract was signed and dated by Davis
November 3, 2003, and by the Norrises November 4, 2003.Â  Exhibit A made part of the third contract was
signed by all the parties and dated only by the Norrises November 3, 2003.Â  The Exhibit A attached to the third contractÂbut not the exhibit
attached to the first contractÂalso
contained the handwritten notation that has become a principal focus of this
case:Â  ÂSeller
will have 9 months notice before Buyer will Close.ÂÂ  All parties initialed this notation.Â  

Â Â Â Â Â Â Â Â Â Â Â  Some years
later, by letter dated March 20, 2006, and mailed March 28,[4]
Davis announced to the Norrises her intent to exercise the option.Â  The letter stated, Âthis letter provides nine
(9) months noticeÂ and provided that closing would be held December 20,
2006.Â  About August 22, 2006, the Norrises
mailed Davis a letter stating that, Â[a]s of this date we have not received an
option contractÂ and describing the requirements of an option to purchase.Â  About November 15, 2006, the NorrisesÂ
attorney sent a letter to Davis stating that Â[m]y clients do not agree that
the terms of Exhibit A create an option in your favor to purchase any of their
property.ÂÂ  The Norrises did not appear
at the time and place designated by Davis for a closing.

Â Â Â Â Â Â Â Â Â Â Â  The first
issue we must decide is which contract to interpret.Â  Davis argues there is a fact issue concerning
whether the Third Contract replaced the First Contract, modified the First
Contract, or is an independent contract.Â 
The Norrises argue the evidence conclusively establishes that the Third
Contract replaced the First Contract.Â 
The determination of which contract controls depends on whether the
contracts were intended to be interpreted together as a single agreement,
whether one contract replaced the other, or whether one contract modified the
other.

Â Â Â Â Â Â Â Â Â Â Â  In Courage Co. v. Chemshare Corp., the
Fourteenth District Court of Appeals held two contracts involving computer
software, which were highly integrated and referenced each other, were both
part of the same agreement and the latter contract did not supersede the
first.Â  93 S.W.3d 323 (Tex. App.ÂHouston
[14th Dist.] 2002, no pet.).Â  In this
case, there is no evidence the contracts were intended to be interpreted
together, forming a single agreement.Â  Neither
contract in this case makes any reference to the other contract.Â  With the exceptions of the Exhibit A of both
contracts, the contracts are otherwise boilerplate real estate form contracts
for purchase of ranch land or farms.Â  We
reject DavisÂ argument that the First Contract and the Third Contract were
intended to be interpreted together.

Â Â Â Â Â Â Â Â Â Â Â  Davis
alternatively argues that a fact issue exists because the Exhibit A to the
First Contract was signed after the Exhibit A to the Third Contract.[5]Â  While the dates on the two exhibits make up
more than a scintilla of evidence that the First Contract was signed after the
Third Contract, the summary judgment evidence conclusively establishes the
Third Contract replaced the First Contract.Â 
As argued by the Norrises, the dates on the contracts do not establish
an order of execution.Â  All three contracts
were executed November 5, 2003.Â  Although
she could not remember when each contract was signed, Davis testified in her
deposition:Â  ÂWe had a contract for 215
plus or minus acres.Â  We wanted to
homestead the house and 10 acres.Â 
Therefore, the first contract was divided into two contracts.ÂÂ  In her deposition, Norris testified that Âthey
separated the contractÂ and later testified the contract was divided Âafter it
was in the title company.ÂÂ  Both parties
testified the First Contract was signed first.Â 
Further, the parties concede that no closing was conducted on the First
Contract.

Â Â Â Â Â Â Â Â Â Â Â  We agree
with the Norrises that the Third Contract was a novation that replaced the
First Contract.Â  A novation is the
substitution of a new agreement in place of an existing agreement.Â  Fulcrum
Cent. v. Autotester, Inc., 102
S.W.3d 274, 277 (Tex. App.ÂDallas 2003, no pet.).Â  The summary judgment evidence conclusively
establishes the Homestead and Third Contracts were novations of the First
Contract.Â  Davis concedes Âwhere there
are two agreements that address the identical topic, but have differing terms,
the one which is executed later controls.ÂÂ 
See Midwest Med. Supply Co. v. Wingert, 317 S.W.3d 530 (Tex.
App.ÂDallas 2010, no pet.).Â  Thus, the
Norrises established, as a matter of law, that the Third Contract governs the
agreement of the parties.

(2)Â Â Â Â Â Â Â  The Contract Is Ambiguous on What Would
Constitute an Exercise of the Option

Â 

Â Â Â Â Â Â Â Â Â Â Â  At trial,
both parties assumed the Third Contract required a nine-month notice to
exercise the option.[6]Â  The NorrisesÂ traditional motion for summary
judgment is based solely on this assumption.Â 
Davis argues on appeal, for the first time, that the nine-month notice
provision is not a term of accepting the option that must have been strictly
fulfilled.[7]

Â Â Â Â Â Â Â Â Â Â Â  At oral
argument, the Norrises asserted that this issue was not presented to the trial
court.Â  To the extent the Norrises argue
that the error is not preserved for our review, we conclude Davis did not
forfeit this issue by failing to raise it in the trial court.[8]Â  The Norrises were required to establish as a
matter of law that they were entitled to summary judgment.Â  See
Tex. R. Civ. P. 166a(c); Clear Creek Basin Auth., 589 S.W.2d 671;
Baubles & Beads v. Louis Vuitton, S.A., 766 S.W.2d 377 (Tex.
App.ÂTexarkana 1989, no writ). Â The
NorrisesÂ motion for summary judgment argued that, because Davis failed to
exercise the option in strict compliance with the option,[9]
no contract was formed to bind the parties to close a sale of the optioned
property.[10]Â  The motion for summary judgment did not
include any alternative theories beyond the nine-month-notice issue.Â  Thus, in order to be entitled to summary
judgment, the Norrises were required to establish, as a matter of law, that the
nine-month-notice provision was a term for exercising the option and that Davis
failed to comply with the provision.

Â Â Â Â Â Â Â Â Â Â Â  The Texas
Supreme Court has held Âsummary judgments must stand or fall on their own
merits, and the non-movantÂs failure to except or respond cannot supply by
default the grounds for [a traditional summary judgment].ÂÂ  McConnell
v. Southside Indep. Sch. Dist., 858 S.W.2d 337, 342 (Tex. 1993); see M.D. Anderson Hosp. & Tumor Inst. v.
Willrich, 28 S.W.3d 22, 23 (Tex. 2000).Â 
Because the Norrises had the obligation to establish, as a matter of
law, that a nine-month notice was required to exercise the option and that
Davis failed to comply with it, Davis did not forfeit this argument by failing
to raise it in her response.Â  We may
review the nine-month-notice issue.

Â Â Â Â Â Â Â Â Â Â Â  In
construing a written contract, our primary concern is to ascertain the true intentions
of the parties as expressed in the instrument.Â 
Coker v. Coker, 650 S.W.2d
391, 393 (Tex. 1983). Â To achieve this
objective, we should examine and consider the entire writing in an effort to
harmonize and give effect to all the provisions of the contract so that none
will be rendered meaningless.Â  Id.Â 
Unless the contract is ambiguous, the court will enforce it as
written.Â  Id.Â  A court may not rewrite
the partiesÂ contract or add to its language under the guise of interpretation.
Â Am.
Mfrs. Mut. Ins. Co. v. Schaefer, 124 S.W.3d 154, 162 (Tex. 2003).Â  If the contract can be given a certain or
definite legal meaning or interpretation, then it is not ambiguous, and the
court will construe it as a matter of law.Â 
Coker, 650 S.W.2d at 393; Guerrero v. Guerra, 165 S.W.3d 778, 782
(Tex. App.ÂSan Antonio 2005, no pet.). Â If,
however, a contract is capable of more than one reasonable interpretation, it
is ambiguous.Â  Schaefer, 124 S.W.3d at 157; Guerrero,
165 S.W.3d at 782.Â  Whether a contract is
ambiguous is a question of law that we review de novo.Â  Shanks
v. Treadway, 110 S.W.3d 444, 447 (Tex. 2003).Â  Granting summary judgment based solely on an
ambiguous contract is improper because the intent of the contracting parties is
an issue of fact.Â  Claxton v. Lake Fork Water Control & Improvement Dist. No. 1,
246 S.W.3d 381, 385 (Tex. App.ÂTexarkana 2008, pet. denied).

Â Â Â Â Â Â Â Â Â Â Â  It has long
been held that, because an option to purchase property is a unilateral benefit
to the optionee, options must be exercised strictly according to the terms of
the agreement.Â  Zeidman v. Davis, 342 S.W.2d 555, 558 (1961); Johnson v. Portwood, 34 S.W. 596, 598 (Tex. 1896).Â  ÂIt is a well-settled principle that strict
compliance with the provisions of an option contract is required.ÂÂ  Besteman,
272 S.W.3d at 784.

Â Â Â Â Â Â Â Â Â Â Â  Here, if the
prospective purchaser is to comply strictly with the terms of the option
agreement, the terms of that option agreement must be more fully determined
than has been done at this stage of the proceedings.Â  A contract is ambiguous when its meaning is
uncertain or doubtful or it is reasonably susceptible to more than one meaning.Â  See
Skelly Oil v. Archer, 356 S.W.2d 774,
778 (Tex. 1961).

Â Â Â Â Â Â Â Â Â Â Â  Neither
party takes the position that the contract itself is ambiguous, and the issue
of ambiguity did not arise in the trial court.Â 
In most circumstances, to consider a matter not raised by a party would
lead this Court into the Serbonian Bog of unassigned error proscribed us by the
Texas Rules of Appellate Procedure.Â  See Tex.
R. App. P. 38.1(f).Â  In a civil
case, this Court is generally prohibited from addressing unassigned error.Â  See
Pat Baker Co. v. Wilson, 971 S.W.2d
447, 450 (Tex. 1998).Â  The issue of
contractual ambiguity, however, can be considered sua sponte by a reviewing
court.Â  Progressive County Mut. Ins. Co. v. Kelley, 284 S.W.3d 805, 808
(Tex. 2009); see also Sage St. Assocs. v. Northdale Constr. Co.,
863 S.W.2d 438, 445 (Tex. 1993) (court can decide on its own motion that
contract is ambiguous).

Â Â Â Â Â Â Â Â Â Â Â  The contract
is at least unclear on what is required to exercise the option.Â  The applicable Exhibit A provides, in full,
as follows:

I.Â  Â Â Â Â Â Â  Eleanor Fox Davis and Assigns, Buyer, has
Option and First Right of Refusal until January 1, 2007 to purchase a total of
up to 327 +/- acres (being the remaining amount of acres owned by William Earl
and Martha Sue Norris, Seller, of the original 545 +/- acres located at 1336 FM
69, Quitman, Texas 75783) at a purchase price of $840.98 per acres.

Â 

II.Â Â Â Â Â Â Â  Sellers
reserve the right to retain a total of up to 147 +/- (being described as 0626
H. Wilson Survey Tract 2 147.3 acres) acres in the southeast section of the
remaining 327 +/- acres.

Â 

III.Â Â Â Â Â Â  Easement to
be identified for the gas line from the meter to the house.

Â 

IV.Â Â Â Â Â Â  Further, both
Buyer and Seller hereby agree to institute and make permanent the following
Deed Restrictions to the 545 +/- acres in entirety to become effective on the
executed date of this contract:

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  SELLER WILL HAVE 9 MONTHS NOTICE 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â  BEFORE BUYER WILL CLOSE.

No Pig Farming Operations

No Chicken Farming Operations

No RV Parking or RV Storage
Operations

No Permanent Trailer Homes

No Mobile Homes

No Commercial Storage Operations

No Homes under 1,000 square feet with
the exeception of any present housing structures located on the northeast side
of the property.

Â 

Â (Handwritten provision italicized).Â  The handwritten, nine-month-notice provision
does not explicitly say that it is a condition to the exercise of the option,
but there is no provision that explicitly sets out the method for
exercise.Â  A deadline of January 1, 2007,
is explicitly set out, but the contract is unclear on precisely what it is a
deadline for.Â  Is it a deadline for
notice of exercise, or of closing on the option property?Â  And, though logically the nine-month-notice
provision and the deadline of January 1, 2007, seem to be related, the contract
is silent on the nature of that relationship.Â 
We conclude that an ambiguity exists as to the option that requires
findings on the partiesÂ intent on just what is required for the option to be
exercised.Â  Based on what is found in
that threshold issue, it might require further findings on whether Davis did
what was required to exercise the option and possibly whether there might have
been some justification for any failure to take that step.Â  Ambiguity exists.

Â Â Â Â Â Â Â Â Â Â Â  We must
affirm the summary judgment if any of the theories presented to the trial court
and preserved for our review are meritorious.Â 
Provident Life & Accident Ins.
Co. v. Knott, 128 S.W.3d 211, 216 (Tex. 2003).Â  None of the theories presented to the trial
court, however, are meritorious.Â  All of
the theories presented to the trial court are based on the assumption that the
nine-month-notice provision is a condition to the exercise of the option; and
that has yet to be determined.

Â 

Â Â Â Â Â Â Â Â Â Â Â  We reverse the summary
judgment of the trial court and remand for proceedings consistent with this
opinion.[11]

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Josh
R. Morriss, III

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Chief
Justice

Â 

Date
Submitted:Â Â Â Â Â Â Â Â Â  July 27, 2011

Date
Decided:Â Â Â Â Â Â Â Â Â Â Â Â  October 25, 2011











[1]DavisÂ
husband, Barnes Davis, did not participate in any of the transactions at issue,
but joins this appeal.Â  We will refer to
Eleanor Fox Davis as Davis, though the term will be inclusive of Mr. Davis, as
appropriate.

Â 





[2]The
judgment awarded the Norrises $16,735.02 in attorneyÂs fees, plus $5,000.00 in
attorneyÂs fees for an appeal to this Court, and $2,500.00 for an appeal to the
Texas Supreme Court.Â  On August 31, 2010,
the Norrises moved for a Âjudgment nunc pro tuncÂ requesting an additional
award of interest.Â  See Tex. Fin. Code Ann.
Â§ 304.001 (West 2006).Â  The trial court
rendered judgment September 3, 2010, adding post-judgment interest at a rate of
five percent.Â  Post-judgment interest is
statutorily mandated and is recoverable even if the judgment does not mention
it.Â Â  NatÂl
Union Fire Ins. Co. v. Wyar, 821 S.W.2d 291, 297 (Tex. App.ÂHouston [1st
Dist.] 1991, no writ); El Universal,
Compania Periodistica Nacional, S.A. de C.V. v. Phoenician Imports, Inc.,
802 S.W.2d 799, 804 (Tex. App.ÂCorpus Christi 1990, writ denied); Crenshaw v. Swenson, 611 S.W.2d 886, 892
(Tex. App.ÂAustin 1980, writ refÂd n.r.e.).Â 
The second judgment is labeled Âjudgment nunc pro tunc,Â but was
rendered while the trial court still had plenary power.

Â 





[3]Because
these conclusions are dispositive of this appeal, it is not necessary to
address DavisÂ remaining issues.





[4]The
record contains a certified mail receipt containing the date the letter was
mailed.

Â 





[5]Exhibit
A to the First Contract was signed November 3 by Davis, and November 4 by the Norrises.Â  Exhibit A to the Third Contract was signed
November 3 by the Norrises, but was signed without a date by Davis.Â  





[6]In
her response, Davis argued that, because the option contained in the First
Contract should govern, there was a fact question concerning whether she was
obligated to give nine monthsÂ notice before closing.Â  

Â 





[7]DavisÂ
first issue is as follows:Â  ÂThe trial
court erred in entering summary judgment based upon the nine monthsÂ notice of
closing for the underlying real estate contract being a condition to exercise
the option.ÂÂ  Davis argues that Â[t]he
disputed term is a term for the underlying contract and does not apply to
either option or the exercise of either option.ÂÂ  Davis later argued:

Â 

Here
the trial court improperly applied the nine months notice as a condition of the
exercise of the option when it actually applied to the underlying real estate
contract.Â  The trial court ignored the
fact that the letter exercising the option was unqualified, unambiguous, and
strictly complied with the options in both Exhibit AÂs.

Â 

The issue is assigned for our review.

Â 





[8]In
reviewing an order granting summary judgment, we are ordinarily restricted to
the arguments expressly presented to the trial court in the written motion for
summary judgment and the response. Â Tex. R. App. P. 33.1; Tex. R. Civ. P. 166a(c); see Clear Creek Basin Auth., 589 S.W.2d
at 677; Driskill v. Ford Motor Co.,
269 S.W.3d 199, 206 (Tex. App.ÂTexarkana 2008, no pet.); see also Martinez, 941
S.W.2d at 912.

Â 





[9]ÂAcceptance
of an option must be unqualified, unambiguous, and strictly in accordance with
the terms of the agreement.Â Â Comeaux v. Suderman, 93 S.W.3d 215, 220
(Tex. App.ÂHouston [14th Dist.] 2002, no pet.); Atterbury v. Brison, 871 S.W.2d 824, 829 (Tex. App.ÂTexarkana 1994,
writ denied) (Cornelius, C.J., concurring); see
Chambers v. Hunt Petroleum Corp., 320
S.W.3d 578, 583 (Tex. App.ÂTyler 2010, no pet.); Besteman v. Pitcock, 272 S.W.3d 777, 784 (Tex. App.ÂTexarkana 2008,
no pet.).Â  ÂAny failure to exercise an
option according to its terms, including an untimely or defective acceptance,
is simply ineffectual, and legally amounts to nothing more than a rejection.ÂÂ  Atterbury,
871 S.W.2d at 829; see Hutcherson v.
Cronin, 426 S.W.2d 638 (Tex. App.ÂTyler 1968, no writ); Lambert v. Taylor Tele. Co-operative,
276 S.W.2d 929 (Tex. App.ÂTyler 1955, no writ).Â 
A timely and proper acceptance of an option, though, creates a binding
bilateral contract.Â  Sinclair Ref. Co. v. Allbritton, 218 S.W.2d 185, 188 (Tex. 1949); Luccia v. Ross, 274 S.W.3d 140, 149
(Tex. App.ÂHouston [1st Dist.] 2008, pet. denied).

Â 





[10]An
option consists of (1) an underlying contract that is not binding until
accepted, and (2) a covenant to hold open to the optionee the option to
accept.Â  Faucette v. Chantos, 322 S.W.3d 901, 908 (Tex. App.ÂHouston [14th
Dist.] 2010, no pet.).Â  ÂWhen the
optionee gives notice or otherwise complies with the terms and conditions of
the optionÂregardless of the existence of consideration for the optionÂa
bilateral executory contract is formed, one party having the duty to convey and
the other the duty to pay.ÂÂ  Hott v. Pearcy/Christon, Inc., 663
S.W.2d 851, 854 (Tex. App.ÂDallas 1983, writ refÂd n.r.e.).





[11]We
make no ruling as to the enforceability of the option, ruling only that the
current summary judgment must fail.